IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RICHARD WILSON and CHRIS MARANTO, <br><br> Plaintiffs, <br><br> v. <br><br> MAXXAM INC., a Delaware corporation; THE PACIFIC LUMBER COMPANY, a Delaware corporation; SCOTIA PACIFIC COMPANY LLC, a Delaware limited liability company; SALMON CREEK LLC, a Delaware limited liability company; and CHARLES E. HURWITZ, an individual, <br><br> Defendants. <br> _____/ | No. C 06-7497 CW <br><br> ORDER DENYING DEFENDANTS' MOTION TO DISMISS |

This is a qui tam action filed under the False Claims Act (FCA) by Plaintiffs/Relators Richard Wilson and Chris Maranto, on behalf of the United States, based upon allegations that Defendants defrauded the United States into contributing $250 million toward the purchase of the Headwaters Forest and Elk Head Springs Forest. The United States Attorney has declined to intervene in this action. Defendants Maxxam Inc. and Charles E. Hurwitz move to

dismiss all causes of action against them.[1] Plaintiffs oppose the motion. The matter was heard on August 16, 2007. Having considered all of the parties' papers and oral argument, the Court denies Defendants' motion.

BACKGROUND

According to Plaintiffs' complaint, this case began in late 1985, when Defendant Hurwitz, a corporate raider, initiated the takeover by Defendant Maxxam of The Pacific Lumber Company.[2] Included in Pacific Lumber's land was the largest privately owned redwood forest in the United States. Before the takeover, Pacific Lumber had carefully managed its redwood forests. Soon after the takeover, however, it became clear that Defendants' priority was short-term profits, not long-term sustainability. Defendant Maxxam announced that it would escalate Pacific Lumber's logging activities to pay off its debt. Pacific Lumber's conservative forest practices became a thing of the past.

In the 1990's, Pacific Lumber Defendants were enjoined from harvesting old-growth timber that served as a habitat for the

---

[1] Defendants The Pacific Lumber Company, Scotia Pacific Company LLC and Salmon Creek LLC (Pacific Lumber Defendants) have filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas. The filing of that bankruptcy petition triggered an automatic stay of all judicial proceedings against them. See 11 U.S.C. § 362(a). Pacific Lumber Defendants have requested that the Bankruptcy Court apply the automatic stay to Defendants Maxxam and Hurwitz.

[2] Defendant Hurwitz controls a majority of Defendant Maxxam's stock and combined voting power: "As a result, Mr. Hurwitz is able to control the election of the Company's Board of Directors and controls the vote on virtually all matters which might be submitted to a vote." Complaint, ¶ 38.

marbled murrelet, an endangered bird.  Pacific Lumber Defendants responded by suing both the state and federal governments, arguing that the enforcement of the Endangered Species Act constituted an unlawful taking of their property.  To resolve this dispute, Defendant Maxxam, Pacific Lumber Defendants, the State of California and the United States entered into an agreement under which Pacific Lumber Defendants agreed to dismiss their pending lawsuits and to sell their old-growth forest, known as the Headwaters Forest, and other land, including the Elk Head Springs Forest, to California and the United States.  Headwaters Forest is now a public wildlife reserve.

As a condition of the purchase, Pacific Lumber Defendants agreed to develop and to implement a sustained yield plan (SYP).  A SYP is a master plan for the operational, environmental, economic and other issues related to timber harvesting over a large area; it is based on a computer simulation that estimates projected timber growth and stocking requirements in relation to a proposed harvest.

In 1997, Congress authorized the appropriation of $250 million to purchase the land from Defendants.  California agreed to pay an additional $130 million.  Before Congress would allocate any money, however, Pacific Lumber Defendants had to dismiss their taking suits and California had to approve the SYP.  In addition, the Secretary of the Interior had to issue an opinion of value.  Both the United States General Accounting Office and the Secretary of the Interior concluded that the $380 million authorized for the purchase fell within the appraised value of the land.

3

Pacific Lumber Defendants developed a SYP that included different "alternatives": "Alternative 25a" provided for an average annual harvest of 136 million board feet; "Alternative 25," Pacific Lumber Defendants' preferred alterative, provided for an annual permissible harvest of 178.8 million board feet per year. In February, 1999, the California Department of Forestry and Fire Protection (CDF) approved "Alternative 25a." Presented with the lower figure, Defendant Hurwitz threatened to cancel the sale of Headwaters Forest.

The United States Fish and Wildlife Service encouraged CDF to approve Alternative 25. On March 1, 1999, Plaintiff Wilson, then CDF Director, approved Alternative 25. At the time, Plaintiff Wilson believed that the SYP model was accurate. He later learned, however, that the SYP did not comply with California environmental standards. For example, Pacific Lumber Defendants included hardwoods in their SYP model and, even including hardwood inventories, the residual stocking levels provided in the SYP were below the Forest Practice Rules' minimum stocking standards. According to Plaintiffs, truthful disclosure of growth and yield in the SYP would have resulted in an annual harvest of approximately ninety to 125 million board feet per year, far less than the 178 million that Defendants needed to pay off their substantial debt. Plaintiffs allege that it was Defendants' debt, and not the long-term sustainability of Pacific Lumber Defendants' timber harvesting practices, that determined the outputs of the SYP model.

4

Plaintiffs estimate that Pacific Lumber Defendants erroneously increased their harvest forecasts by approximately thirty percent. Plaintiff Wilson would not have approved the SYP had he known it was false.

Just a couple of years after the Headwaters Forest sale was completed, issues arose with the SYP. On November 16, 2001, Plaintiff Maranto, a CDF Sustained Yield Forester, received a memo from CDF Humboldt Ranger Unit inspectors that concluded: "As matters have developed, we are concerned that the SYP document is viewed by [Pacific Lumber Defendants] as an academic modeling exercise with little or no connection to any actual on-the-ground practices that are implemented." Complaint, ¶ 108. In 2002, Plaintiff Maranto noted inconsistencies in Pacific Lumber Defendants' SYP modeling outputs. In a September, 2002 email to his supervisors, Plaintiff Maranto noted that Pacific Lumber Defendants have "a lot of explaining to do." A few months later, he sent another email to his supervisors: "I don't know if all this is nothing more than a comedy of errors, or outright fraud purposefully devised to liquidate as much as possible, or the Department has been dealing with a bunch of amateurs since day one, but it is mind boggling that some very basic modeling elements could have been innocently overlooked." Complaint, ¶ 117.

In an April, 2003 meeting, Plaintiff Maranto expressed his concerns with the Pacific Lumber Defendants' SYP modeling to then CDF Director, Andrea Tuttle, and others at CDF. Specifically, he noted the use of hardwoods in meeting residual stocking levels, the

conversion to Douglas fir, allowing Defendants to harvest more in the front-end of the harvest schedule, and the apparent liquidation of conifers in certain silviculture regime modeling routines.[3] He informed Ms. Tuttle that "competent foresters don't make all of these kinds of mistakes." Complaint, ¶ 122. In the summer of 2004, Plaintiff Maranto concluded that Pacific Lumber Defendants' "1999 SYP model was likely intentionally skewed with a view to inflating the permissible timber harvest." Complaint, ¶ 131.

In 2005, after learning of the high volume of timber Pacific Lumber Defendants were harvesting, Plaintiff Wilson started questioning the accuracy of the SYP. In July, 2006, Plaintiff Wilson called Plaintiff Maranto to inquire about Pacific Lumber Defendants' SYP modeling. Plaintiffs met the next month. Mr. Wilson learned from Mr. Maranto that Pacific Lumber Defendants' SYP was false because it was based on a flawed and distorted modeling methodology. Collectively, the two concluded that Defendants had defrauded the United States government by submitting a fraudulently modeled SYP in order to obtain $250 million in federal funds for the Headwaters and Elk Head Springs Forests.

## DISCUSSION

Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' claims because the alleged information that forms the basis of this action was already publicly disclosed and because Plaintiffs are not "original

---

[3] Plaintiffs explain that "silviculture" is the "practice of growing trees by determining how a stand of trees should be tended, harvested, and regenerated to achieve future stand conditions." Complaint, ¶ 56 n.2.

6

1 sources." In the alternative, they contend that the statute of
2 limitations has run, the alleged fraud is not plead with
3 specificity, the alleged fraud is not the proper subject of a FCA
4 action and the United States has been paid in full and, therefore,
5 there is no false claim.

I. Motion to Dismiss Under Rule 12(b)(1)

   A. Legal Standard

Subject matter jurisdiction is a threshold issue which goes to the power of the court to hear the case. Therefore, a Rule 12(b)(1) challenge should be decided before other grounds for dismissal, because they will become moot if dismissal is granted. Alvares v. Erickson, 514 F.2d 156, 160 (9th Cir. 1975). A federal court is presumed to lack subject matter jurisdiction until the contrary affirmatively appears. Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

Dismissal is appropriate under Rule 12(b)(1) when the district court lacks subject matter jurisdiction over the claim. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion may either attack the sufficiency of the pleadings to establish federal jurisdiction, or allege an actual lack of jurisdiction which exists despite the formal sufficiency of the complaint. Thornhill Publ'q Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979); Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987).

   B. Discussion

The False Claims Act provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing,

7

> in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

To determine whether it has jurisdiction, the Court must first determine whether there has been a prior "public disclosure" of the "allegations or transactions" underlying the qui tam suit. United States ex rel. Foundation Aiding The Elderly v. Horizon West, 265 F.3d 1011, 1014 (9th Cir. 2001). The Ninth Circuit instructs that, although the public disclosure must reveal the "allegations or transactions" underlying the plaintiff's complaint, the substance of the disclosure "need not contain an explicit 'allegation' of fraud, so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." Id. Nor need the publicly disclosed documents "precisely mirror the allegations stated in the qui tam lawsuit in order for the jurisdictional bar to operate." United States ex rel. Rosales v. San Francisco Housing Authority, 173 F. Supp. 2d 987, 995 (N.D. Cal. 2001).

The Ninth Circuit further instructs:

> In analyzing whether allegations of fraud were previously disclosed, we must determine whether there was a public disclosure of fraud which was "substantially similar to those disclosed in the earlier . . . action." See United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027, 1033 (9th Cir. 1998). In analyzing whether the transactions underlying a relator's complaint were publicly disclosed, however, we adopt the analysis first laid out by the District of Columbia Circuit in Springfield Terminal:
>
>> [I]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$ represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of $X$ and $Y$ must be revealed, from which

8

>    readers or listeners may infer Z, i.e., the conclusion
>    that fraud has been committed.

Foundation Aiding The Elderly, 265 F.3d at 1015 (quoting United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994)).

The Ninth Circuit has clarified that, although courts sometimes speak of qui tam suits being barred based on "publicly disclosed information," the "Act bars suits based on publicly disclosed 'allegations or transactions,' not information." Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992) (quoting U.S.C. § 3730(e)(4)(A)).  The distinction between "information" and "allegations or transactions," is not mere semantics: "where the public knows of information proving an allegation, it necessarily knows of the allegation itself.  But the reverse is not always true.  An allegation can be made public, even if its proof remains hidden."  Id.  Thus, even "allegations divorced from the information upon which they are based can constitute public disclosure."  United States v. Alcan Electrical and Engineering, Inc., 197 F.3d 1014, 1020 (9th Cir. 1999).  Nonetheless, the prior public disclosures must contain "enough information to enable the government to pursue an investigation."  Id. at 1019.

Defendants argue that there have been at least three earlier lawsuits in which allegations were made that the SYP was developed through the use of flawed, erroneous or fraudulent data, undermining the validity of the conclusion that Pacific Lumber Defendants' land can sustain long-term yields.  In the petition for writ of mandate in Environmental Protection Information Association

9

1  v. California Department of Forestry and Fire Protection, filed in
2  1999 in the County of Sacramento Superior Court, the petitioners
3  sought to set aside CDF's decision approving Pacific Lumber
4  Defendants' SYP; they alleged that the SYP "was inadequate and
5  incomplete and invalid" because it failed to provide "a clear
6  demonstration, through accurate facts, mapping, presentation of
7  current conditions, and existing constraints, of how the SYP will
8  achieve maximum sustained production of high quality timber
9  products." Defendants' Request for Judicial Notice, Ex. E, ¶ 106.
10 In another case filed in 1999 in the County of Sacramento Superior
11 Court, United States Steel Workers v. California Department of
12 Forestry and Fire Protection, the petitioners alleged that CDF
13 abused its discretion in approving Pacific Lumber Defendants' SYP
14 because it did "not satisfy the legal requirement to clearly
15 demonstrate how Pacific Lumber will achieve maximum sustained
16 production of high quality timber." Defendants' Request for
17 Judicial Notice, Ex. F, ¶ 18.
18      A case filed by the District Attorney of Humboldt County in
19 1993 alleged that, in violation of California's Unfair Competition
20 Law, Pacific Lumber Defendants provided false information to the
21 government and fraudulently concealed required information from the
22 government in order minimize harvesting restrictions designed to
23 protect wildlife and water quality. The People of the State of
24 California v. The Pacific Lumber Company, Case No. DR030070,
25 Defendants' Request for Judicial Notice, Ex. G, ¶ 2. That suit
26 alleged that Pacific Lumber Defendants fraudulently took $300

million from the taxpayers of the United States and California. Id. It further alleged, as Plaintiffs here allege, that Pacific Lumber Defendants' acts were motivated by the desire to increase the permitted volume of their annual timber harvest in order to meet the financial obligations imposed by their sale of almost a billion dollars of bonds. Id. at ¶ 4. The allegedly false information in Pacific Lumber Defendants' SYP in that suit, however, concerned land slide projections, water quality and sedimentation, not at issue here. Fraudulent SYP modeling based on the improper inclusion of hardwoods and other allegations at issue here were not alleged in that action.

These public documents point to defects in the SYP. Like Plaintiffs here, the County of Humboldt District Attorney alleged that the SYP is fraudulent and that Pacific Lumber Defendants defrauded the government, in part, so that they could harvest more timber and pay off their mounting financial obligations. Like Plaintiffs here, he alleged that American and California taxpayers were defrauded. Like Plaintiffs here, the United States Steelworkers alleged the Pacific Lumber Defendants failed to explain how they would achieve maximum sustained production of timber. The allegations here do not, as Defendants argue, mirror the allegations made in the earlier lawsuits. As noted above, however, the publicly disclosed documents need not mirror the allegations stated in the qui tam lawsuit. Rosales, 173 F. Supp. 2d at 995.

Plaintiffs correctly point out that the public documents upon which Defendants rely do not disclose the facts on which Plaintiffs

11

base this case.  However, the public documents need not disclose all the facts on which Plaintiffs base their case.  See id. at 996 (concluding that, although all of the purported means by which the defendants' fraud was perpetrated "may not have been commonly known, the prior public disclosures contained enough information to enable the government to pursue an investigation into them," which was "enough to trigger the jurisdictional bar").  Rather, the public documents "must contain enough information to enable the government to pursue an investigation."  Alcan, 197 F.3d at 1019.  Although the public documents at issue contain enough information to alert the government to fraud in general, they do not contain enough information to allow the government to pursue an investigation into the alleged fraud at issue here.  Further, although the allegations are similar, they are not substantially similar, as required in Foundation Aiding The Elderly, 265 F.3d at 1015.  Therefore, the Court finds that there has been no prior public disclosure of the allegations underlying this qui tam suit and that it has jurisdiction.

Even if there had been a prior public disclosure, this Court would still have jurisdiction if one of Plaintiffs is an original source.  To be an "original source," a plaintiff must have "direct and independent knowledge of the information on which the allegations are based," and have "voluntarily provided the information to the Government before filing an action."  31 U.S.C. § 3730(e)(4)(B).  The Ninth Circuit has held that an internal federal government auditor, compelled to disclose fraud by the terms of his employment, cannot "voluntarily" provide information

12

pursuant to section 3730(e)(4)(B) and, therefore, cannot be an original source. United States ex rel. Fine v. Chevron, U.S.A., Inc., 72 F.3d 740 (9th Cir. 1995) (en banc). The following year, the Ninth Circuit held that an Army Corps of Engineers attorney was an original source, despite his fiduciary responsibility to disclose to his superiors what he thought the law required, because, unlike the internal auditor in Fine, the attorney's "job was not to expose fraud, but to draft contracts and perform other legal services for the Corps." Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1476 n.19 (9th Cir. 1996). Two years later, the Ninth Circuit held that a Resident Representative Administrative Contracting Officer for the Office of Naval Research, whose employment duties included "some aspect" of auditing work, could not be an original source. United States ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ., 161 F.3d 533, 542 (9th Cir. 1998). The court reasoned, "The purposes underlying the FCA are to encourage individuals to report potential fraudulent activities being committed against the government, and to reward them for doing so. But where a government employee is paid to perform this function, the employee should not receive a windfall for merely doing his job." Id.

Defendants argue that, under Fine and Biddle, Plaintiffs cannot be original sources. Plaintiffs respond that Plaintiff Maranto is an original source; they do not contend that Plaintiff Wilson is an original source. Plaintiffs note that, unlike the government employee in Fine, Plaintiff Maranto is not a federal employee. He is employed by the State of California. Defendants

13

argue that this is an irrelevant distinction; however, they cite no case that has applied <u>Fine</u> to state employees.  Plaintiff Maranto is not compelled by the terms of his employment to disclose fraud to the federal government.  He is paid to review sustained yield plans and report any fraud to state officials, not to the United States.  Therefore, the Court concludes that Plaintiff Maranto can "voluntarily" provide information pursuant to section 3730(e)(4)(B) and, therefore, he is an original source.

II.   Motion to Dismiss Under Rule 12(b)(6)

    A.   Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  A plaintiff need not set out in detail the facts upon which he or she bases her claim; however, the plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957); <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964 (2007).  As the Supreme Court recently explained, "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp.</u>, 127 S. Ct. at 1964-65 (inner citations and alteration omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 1965.  All material allegations in the complaint, "even if doubtful in fact,"

14

are assumed to be true, id., and are construed in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

B. Discussion

    1. Statute of Limitations

The False Claims Act bars any civil action brought (1) more than six years after the date on which the violation is committed or (2) more than 3 years "after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last." 31 U.S.C. § 3731(b). For a qui tam plaintiff, the three-year limitations period runs from the date the plaintiff knew or reasonably should have known of the facts material to the right of action. United States ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1213 (9th Cir. 1996).

Defendants argue that, under both the first and second prongs, the statute of limitations has lapsed on Plaintiffs' claims and, therefore, the Court should dismiss this case. They note that the alleged violation took place over six years ago, in 1999, when CDF approved the allegedly fraudulent SYP. And they point out that, according to Plaintiffs' complaint, Plaintiff Maranto first discovered in 2001 that the computer modeling Pacific Lumber Defendants used for their SYP was problematic; in 2002, he informed his supervisors of his concerns regarding the SYP modeling on at

1 least four occasions.  Yet, Plaintiffs did not bring this complaint
2 until December, 2006.

3     Plaintiffs respond that their suit should not be dismissed on
4 statute of limitations grounds unless their complaint alleges facts
5 demonstrating that the second prong, containing a tolling
6 provision, does not apply.  See United States v. Tech
7 Refrigeration, 143 F. Supp. 2d 1006, 1007 (N.D. Ill. 2001) (noting
8 that "the government would have pleaded itself out of court,
9 requiring dismissal of the complaint," if the facts alleged in the
10 complaint demonstrated that the tolling provision did not apply).
11 They note that the complaint does not allege that, prior to meeting
12 with Plaintiff Wilson in 2006, Plaintiff Maranto knew that the SYP
13 was a condition of the Headwaters and Elk Head Springs Forests
14 appropriation and that Plaintiff Wilson would not have approved the
15 SYP if he had known it was erroneous.  Further, according to the
16 complaint, it was not until the summer of 2004 that Plaintiff
17 Maranto concluded that Pacific Lumber Defendants had intentionally
18 skewed the SYP.  See Complaint, ¶ 131.

19     The Court agrees that it is not "apparent from the face of the
20 complaint that the claim is time-barred."  La Grasta v. First Union
21 Sec., Inc., 358 F.3d 840, 848 (9th Cir. 2004) (inner citations
22 omitted).  Therefore, it cannot dismiss Plaintiffs' complaint on
23 statute of limitations grounds.

24     2.  Required Specificity

25     "In all averments of fraud or mistake, the circumstances
26 constituting fraud or mistake shall be stated with particularity."
27 Fed. R. Civ. P. 9(b).  Defendants contend that Plaintiffs fail to
28

16

plead with the specificity required by Rule 9(b), obliging the Court to dismiss the allegations against them. As in any cause of action sounding in fraud, the allegations of a FCA claim must be plead with particularity. Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001). As such, they must be "'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" Id. at 1019 (quoting Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993)). However, the plaintiff need not "allege, in detail, all facts supporting each and every instance of [a FCA claim] over a multi-year period." United States ex rel. Lee v. Smithkline Beecham, Inc., 245 F.3d 1048, 1051 (9th Cir. 2001); see also Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997) (where complaint asserting claims of improper revenue recognition identified (i) some of the specific customers defrauded, (ii) the type of conduct at issue, (iii) the general time frame in which the conduct occurred, and (iv) why the conduct was fraudulent, it was "not fatal to the complaint that it [did] not describe in detail a single specific transaction . . . by customer, amount, and precise method").

Plaintiffs have attempted to plead the elements of a FCA claim with respect to Pacific Lumber Defendants and Defendant Maxxam (which allegedly "controls and directs" the Pacific Lumber Defendants' activities). Their allegations are sufficient. Rule 9(b) may be relaxed where the evidence of fraud is within a defendant's exclusive possession, as it may be here. Lee, 245 F.3d

17

at 1051; <u>United States ex rel. Walsh v. Eastman Kodak Co.</u>, 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (noting that Rule 9(b) was relaxed "somewhat, because the facts relating to the alleged fraud are 'peculiarly within the perpetrator's knowledge'").

Plaintiffs' alter-ego allegations concerning Defendant Hurwitz are also sufficient. Defendants argue that Plaintiffs' complaint does not contain facts establishing that Defendant Hurwitz exercised complete dominion and control and that this domination was used to commit fraud. The complaint includes an excerpt from a SEC report that explains that Defendant Hurwitz "controls the vote on virtually all matters which might be submitted to a vote" of Maxxam stockholders. Complaint, ¶ 38. See <u>In re Napster, Inc. Copyright Litig.</u>, 354 F. Supp. 2d 1113, 1122 (N.D. Cal. 2005) (holding an allegation that one of the major shareholders had "essentially full operational control" over Napster during a specified period was sufficient to justify allowing plaintiffs to proceed on an alter-ego theory). A parties' alter-ego theory need not be alleged with particularity. <u>Matlink, Inc. v. Matlink, Inc.</u>, 2006 U.S. Dist. LEXIS 83508 (S.D. Cal. 2006).

Therefore, the Court will not dismiss Plaintiffs' complaint for failure to plead with specificity.

3. Substantive Arguments

Defendants contend that judicially noticed facts establish that the United States received full value for the agreement and, therefore, there can be no false claim. According to Defendants, the allegedly fraudulent SYP was not essential to the United States' decision to allocate $250 million to purchase the land at

18

issue. They point out that the land was appraised at between $135 to $405 million, an appraisal the General Accounting Office approved. The fact that the United States may have been paid in full in accordance with the agreement, however, is irrelevant if the purchase price was influenced by fraud. Further, as Plaintiffs note, Defendants ask the Court to make findings on questions of fact that cannot be made on the record provided, even including the judicially noticed documents.

Defendants further contend that the alleged fraud at issue is not within the proper scope of a FCA action. They argue that Plaintiffs' claim concerning an allegedly "fraudulently modeled" SYP is nothing more than a dispute over scientific methods and that the FCA does not concern itself with scientific disputes. See Wang, 975 F.2d at 1421 ("the phrase 'known to be false' in that sentence does not mean 'scientifically untrue'; it means 'a lie.'"). Indeed, the Ninth Circuit has instructed, "Proof of one's mistakes or inabilities is not evidence that one is a cheat." Id. Plaintiffs counter that Defendants' argument finds no support on the face of the complaint. They note that they allege that Defendants knew that they were defrauding the federal government; the complaint links the SYP model manipulations to Defendants' financial objectives.

Plaintiffs' complaint states a FCA claim and, therefore, the Court will not dismiss it for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion To Dismiss

19

1 (Docket No. 17) is DENIED.[4]

2    IT IS SO ORDERED.

3         9/20/07

4 Dated: _____



CLAUDIA WILKEN
United States District Judge

---

[4]Defendants' Request for Judicial Notice (Docket No. 18) is GRANTED.  Plaintiffs' objection to Exhibits B and C are without merit.  As Defendants note, these two exhibits are government documents that are capable of accurate and ready determination.  By taking judicial notice of these public records, however, the Court is only taking notice of the existence of these matters of public record and "not of the veracity of arguments or disputed facts in the document."  <u>Cactus Corner, LLC v. U.S. Dept. of Agriculture</u>, 346 F. Supp. 2d 1075, 1099 (E.D. Cal. 2004).  Defendants' Further Request for Judicial Notice (Docket No. 19) is also GRANTED.