**United States District Court**
For the Northern District of California

1

2

3

4

5

6
IN THE UNITED STATES DISTRICT COURT

7
FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9
UNITED STATES OF AMERICA <u>ex rel.</u>
RICHARD WILSON and CHRIS MARANTO,

10
                                        No. C 06-7497 CW

                                        ORDER DENYING
                                        DEFENDANTS' MOTION
11          Plaintiffs,                  FOR JUDGMENT ON THE
                                        PLEADINGS
12     v.

13
MAXXAM, INC., <u>et al.</u>,

14          Defendants.
_____/

15

16

17     This is a <u>qui tam</u> action filed under the False Claims Act by

18 Plaintiffs/Relators Richard Wilson and Chris Maranto, on behalf of

19 the United States, based upon allegations that Defendants made

20 false statements to the California Department of Forestry and Fire

21 Protection (CDF) in a sustained yield plan (SYP) in order to

22 defraud the United States into contributing $250 million toward the

23 purchase of the Headwaters Forest and Elk Head Springs Forest.  The

24 United States Attorney has declined to intervene in this action.

25 Defendants Maxxam Inc. and Charles E. Hurwitz[1] now move for

26     _____

27     [1]Defendants Pacific Lumber Company, Scotia Pacific Company LLC
and Salmon Creek LLC filed a voluntary petition for reorganization
under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy
28 Court for the Southern District of Texas.  The bankruptcy action
                                        (continued...)

judgment on the pleadings, on the basis that their alleged activities are protected by the First Amendment right to petition the government.  Plaintiffs oppose the motion.  The matter was heard on October 16, 2008.  Having considered oral argument and all of the papers submitted by the parties, the Court denies Defendants' motion.

                            BACKGROUND

    According to the complaint, the origins of this case date back to late 1985, when Hurwitz, a corporate raider, initiated the takeover by Maxxam of the Pacific Lumber Company.[2]  Hurwitz controls a majority of Maxxam's stock and combined voting power. "As a result, Mr. Hurwitz is able to control the election of the Company's Board of Directors and controls the vote on virtually all matters which might be submitted to a vote."  Compl. ¶ 38.

    Included in Pacific Lumber's land was the largest privately owned redwood forest in the United States.  Before the takeover, Pacific Lumber had carefully managed its redwood forests.  Soon after the takeover, however, it became clear that Defendants' priority was short-term profits, not long-term sustainability.  Maxxam announced that it would escalate Pacific Lumber's logging activities to pay off its debt.  Pacific Lumber's conservative forest practices became a thing of the past.

    In the 1990s, Pacific Lumber was enjoined from harvesting

---

    [1](...continued)
has been resolved, and these Defendants have been, or are being, dissolved and their assets transferred to other entities.  They do not join in the present motion.  All references to "Defendants" in this order are to Hurwitz and Maxxam only.

    [2]Defendants Scotia Pacific Company LLC and Salmon Creek LLC were wholly owned subsidiaries of Pacific Lumber.

                                2

old-growth timber that served as a habitat for the marbled murrelet, an endangered species of bird.  It responded by suing both the state and federal governments, arguing that the enforcement of the Endangered Species Act constituted an unlawful taking of its property.  To resolve this dispute, Maxxam, Pacific Lumber, the State of California and the United States entered into an agreement under which Pacific Lumber agreed to dismiss its pending lawsuits and to sell its old-growth forest, known as the Headwaters Forest, and certain other land, including the Elk Head Springs Forest, to California and the United States.  Headwaters Forest is now a public wildlife reserve.

As a condition of the purchase, Pacific Lumber agreed to develop and to implement an SYP for its retained properties.  An SYP is a master plan for the operational, environmental, economic and other issues related to timber harvesting over a large area. It is based on a computer simulation that estimates projected timber growth and stocking requirements in relation to a proposed harvest.

In 1997, Congress authorized the appropriation of $250 million to purchase the land from Defendants.  California agreed to pay an additional $130 million.  Before Congress would allocate any money, however, Pacific Lumber had to dismiss its taking lawsuits and California had to approve the SYP.  In addition, the Secretary of the Interior had to issue an opinion of value.  Both the United States General Accounting Office and the Secretary of the Interior concluded that the $380 million authorized for the purchase fell within the appraised value of the land.

Pacific Lumber developed an SYP that included different

3

"alternatives": Alternative 25a provided for an average annual harvest of 136 million board feet; Alternative 25, Pacific Lumber's preferred alterative, provided for a permissible harvest of 178.8 million board feet per year.  In February, 1999, the CDF approved Alternative 25a.  Presented with the lower figure, Hurwitz threatened to cancel the sale of Headwaters Forest.

The United States Fish and Wildlife Service encouraged CDF to approve Alternative 25.  On March 1, 1999, Plaintiff Wilson, then Director of CDF, approved Alternative 25.  At the time, Wilson believed that the SYP model was accurate.  He later learned, however, that the SYP did not comply with California environmental standards.  For example, Pacific Lumber included hardwoods in the SYP model and, even including hardwood inventories, the residual stocking levels provided in the SYP were below the Forest Practice Rules' minimum stocking standards.  According to Plaintiffs, truthful disclosure of growth and yield in the SYP would have resulted in an annual harvest of approximately ninety to 125 million board feet per year, far less than the 178 million that Defendants needed to pay off their substantial debt.  Plaintiffs allege that it was Defendants' debt, and not the long-term sustainability of Pacific Lumber's timber harvesting practices, that determined the outputs of the SYP model.  Plaintiffs estimate that Pacific Lumber erroneously increased its harvest forecasts by approximately thirty percent.  Wilson would not have approved the SYP had he known it was false.

Just a couple of years after the Headwaters Forest sale was completed, issues arose with the SYP.  On November 16, 2001, Plaintiff Maranto, a CDF Sustained Yield Forester, received a memo

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

from CDF Humboldt Ranger Unit inspectors that concluded, "As matters have developed, we are concerned that the SYP document is viewed by [Pacific Lumber] as an academic modeling exercise with little or no connection to any actual on-the-ground practices that are implemented." Compl. ¶ 108. In 2002, Maranto noted inconsistencies in Pacific Lumber's SYP modeling outputs. In a September, 2002 email to his supervisors, Maranto noted that Pacific Lumber had "a lot of explaining to do." A few months later, he sent another email to his supervisors: "I don't know if all this is nothing more than a comedy of errors, or outright fraud purposefully devised to liquidate as much as possible, or the Department has been dealing with a bunch of amateurs since day one, but it is mind boggling that some very basic modeling elements could have been innocently overlooked." Id. ¶ 117.

In an April, 2003 meeting, Maranto expressed his concerns with Pacific Lumber's SYP modeling to then-CDF Director Andrea Tuttle and others at CDF. Specifically, he noted the use of hardwoods in meeting residual stocking levels, the conversion to Douglas fir, allowing Pacific Lumber to harvest more in the beginning of the harvest schedule, and the apparent liquidation of conifers in certain silviculture regime modeling routines.[3] He informed Ms. Tuttle that "competent foresters don't make all of these kinds of mistakes." Id. ¶ 122. In the summer of 2004, Maranto concluded that Pacific Lumber's 1999 SYP model "was likely intentionally skewed with a view to inflating the permissible timber harvest."

---

[3]According to the complaint, "silviculture" is the "practice of growing trees by determining how a stand of trees should be tended, harvested, and regenerated to achieve future stand conditions." Compl. ¶ 56 n.2.

**United States District Court**
For the Northern District of California

Id. ¶ 131.

In 2005, after learning of the high volume of timber Pacific Lumber was harvesting, Wilson started questioning the accuracy of the SYP.  In July, 2006, Wilson called Maranto to inquire about Pacific Lumber's SYP modeling.  Plaintiffs met the next month. Wilson learned from Maranto that Pacific Lumber's SYP was false because it was based on a flawed and distorted modeling methodology.  Collectively, the two concluded that Defendants had defrauded the United States government by submitting a fraudulently modeled SYP in order to obtain $250 million in federal funds for the Headwaters and Elk Head Springs Forests.

Plaintiffs filed this lawsuit in December, 2006, asserting claims under the federal False Claims Act based on the false statements contained in the SYP.  Plaintiffs also filed a parallel lawsuit in the Superior Court of San Francisco County alleging violations of California's False Claims Act.  On September 8, 2008, the state court granted Defendants' motion for judgment on the pleadings, finding that Plaintiffs' claims were barred by the First Amendment right to petition the government.  In doing so, the court adopted the decision of the California Court of Appeal in People ex rel. Gallegos v. Pacific Lumber Co., 158 Cal. App. 4th 950 (2008), in which Pacific Lumber was charged with violating the California Unfair Competition Law (UCL) in connection with its efforts to obtain approval of the SYP.

LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides, "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.  Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).

DISCUSSION

Defendants argue that the claims against them are barred by the First Amendment of the United States Constitution, which provides, "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.[4]  Defendants' argument is based on the Noerr-Pennington doctrine, which arose in the antitrust context.  The Ninth Circuit has described the origin of the doctrine as follows:

> In Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), trucking companies brought suit against railroad companies alleging that efforts by the railroads to influence legislation regulating trucking violated the Sherman Act.  Id. at 129.  The Court held that "the Sherman Act does not prohibit . . . persons from associating . . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."  Id. at 136-37.  In reaching this conclusion, the Court observed that

_____

[4]Plaintiffs argue that, because Defendants did not invoke First Amendment immunity in their answer, they have waived their right to do so now.  The Ninth Circuit has not ruled on whether Noerr-Pennington immunity is an affirmative defense that must be plead.  The Court finds that, because it would be unconstitutional to impose sanctions for a defendant's exercise of its First Amendment rights, and because a complaint must therefore "contain specific allegations demonstrating that the Noerr-Pennington protections do not apply," Boone v. Redevelopment Agency of City of San Jose, 841 F.2d 886, 894 (9th Cir. 1988), First Amendment immunity is "not merely an affirmative defense," McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1558 n.9 (11th Cir. 1992).  Defendants thus did not waive their right to invoke such immunity.

United States District Court
For the Northern District of California

construing the Sherman Act to reach such conduct "would raise important constitutional questions" respecting the right of petition, stating "we cannot . . . lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights. Id. at 138.

United Mine Workers v. Pennington, 381 U.S. 657 (1965), extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anticompetitive intent or purpose. Subsequently, in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), the Court, recognizing that "the right to petition extends to all departments of the government" and that "[t]he right of access to the courts is . . . but one aspect of the right of petition," extended Noerr-Pennington immunity to the use of "the channels and procedures of state and federal . . . courts to advocate [groups'] causes and points of view respecting resolution of their business and economic interests vis-á-vis their competitors." Id. at 510-11.

Sosa v. DIRECTV, Inc., 437 F.3d 923, 929-30 (9th Cir. 2006) (alteration and omissions in Sosa).

The Noerr-Pennington doctrine has subsequently been extended to prohibit claims other than for violations of the antitrust laws where the cause of action is based on the defendant's exercise of its right to petition the government. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983) (applying the doctrine to preclude a claim under the National Labor Relations Act based on the filing of a lawsuit in retaliation for employees' picketing the defendant's restaurant); Sosa, 437 F.3d 923 (holding that a claim under the Racketeer Influenced and Corrupt Organizations Act could not be based on the plaintiffs' allegation that the defendant committed extortion and wire fraud by sending a pre-litigation letter demanding payment in order to avoid being sued).

An exception exists to the general rule of the Noerr-Pennington doctrine: immunity can be lost if the efforts to

petition the government "are a mere sham, undertaken solely to

interfere with free competition and without the legitimate

expectation that such efforts will in fact induce lawful government

action." Omni Res. Dev. Corp. v. Conoco, Inc., 739 F.2d 1412, 1413

(9th Cir. 1984).   The Supreme Court has explained:

> The "sham" exception to Noerr encompasses situations in
> which persons use the governmental process -- as opposed
> to the outcome of that process -- as an anticompetitive
> weapon.   A classic example is the filing of frivolous
> objections to the license application of a competitor,
> with no expectation of achieving denial of the license
> but simply in order to impose expense and delay.   A
> "sham" situation involves a defendant whose activities
> are not genuinely aimed a procuring favorable government
> action at all, not one who genuinely seeks to achieve his
> governmental result, but does so through improper means.

City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380

(1991).

The scope of the sham exception depends on the particular

nature of the petitioning activity.   The exception is relatively

well defined when it is invoked to enjoin the filing of lawsuits.

In this scenario, the Ninth Circuit has identified three

circumstances in which the exception applies:

> first, where the lawsuit is objectively baseless and the
> defendant's motive in bringing it was unlawful; second,
> where the conduct involves a series of lawsuits brought
> pursuant to a policy of starting legal proceedings
> without regard to the merits and for an unlawful purpose;
> and third, if the allegedly unlawful conduct consists of
> making intentional misrepresentations to the court,
> litigation can be deemed a sham if a party's knowing
> fraud upon, or its intentional misrepresentations to, the
> court deprive the litigation of its legitimacy.

Sosa, 437 F.3d at 939 (citations and internal quotation marks

omitted).   If any of these exceptions applies, liability can be

constitutionally imposed for the act of initiating litigation.

It is less clear how the sham exception applies when the

United States District Court
For the Northern District of California

petitioning conduct is something other than the filing of lawsuits:

> For instance, if the alleged anticompetitive behavior consisted of lobbying a state legislature (as in <u>Noerr</u>), rather than filing a suit in state court, it would seem quite pointless to ask whether the lobbying effort was "objectively baseless." To decide objective baselessness, we would need objective standards, of which there are few, if any, in the political realm of legislation, against which to measure the defendant's conduct.
>
> Similarly, the second and third variants of the litigation sham exception do not make sense in the legislative realm. Subjecting a defendant to antitrust liability because it pursued a pattern of baseless legal claims does not generate the same collateral consequences as subjecting the same defendant to antitrust liability because it engaged in numerous unsuccessful attempts to lobby a state legislature -- the latter would eviscerate the Petition Clause. And the sham exception for intentional fraud on a court cannot lightly be taken to apply in a legislative context because, as the Supreme Court has observed, the political arena has a higher tolerance for outright lies than the judicial arena does.

<u>Kottle v. Nw. Kidney Ctrs.</u>, 146 F.3d 1056, 1061 (9th Cir. 1998). Accordingly, all that can be said is that, if the petitioning activity is oriented toward the legislature, "the sham exception is extraordinarily narrow" and the activity enjoys a broader scope of immunity. <u>Id.</u>

With respect to petitioning administrative agencies, the scope of <u>Noerr-Pennington</u> immunity depends on the degree of political discretion exercised by the government agency. If the agency acts as an adjudicative body, the range of petitioning activities afforded immunity is narrower than if it is essentially a political body. <u>Id.</u> at 1061-62. Matters before an administrative agency should be treated like judicial proceedings to the extent the agency's actions "are guided by enforceable standards subject to review." <u>Id.</u> at 1062. Thus, under these circumstances, liability cannot be imposed for petitioning an administrative agency unless

the petition is a sham: objectively baseless, part of a series of meritless petitions or rendered illegitimate by misrepresentations made to the agency.  If, on the other hand, the agency is not guided by enforceable standards and is thus more akin to a political body, the sham exception is "extraordinarily narrow" and the activity enjoys a broader scope of immunity.

Defendants' argument that the Noerr-Pennington doctrine protects their conduct fails for two principal reasons.  First, Defendants' interactions with the United States did not constitute petitioning activity and thus do not implicate Noerr-Pennington immunity in any way.  Defendants did not, for example, lobby Congress to pass legislation that was favorable to them or attempt to persuade a federal regulatory body to grant them permission to take a particular course of action.[5]  Rather, they entered into a business deal with the United States for the purchase of their land.  Defendants have not cited any case in which the Noerr-Pennington doctrine was found to protect conduct in connection with business negotiations with the government.  This alone is a sufficient basis for denying the present motion.

Second, even assuming that Defendants' negotiations with the United States did constitute a petition -- and they did not -- the Noerr-Pennington doctrine does not apply here because it merely precludes liability from being imposed for the act of petitioning the government.  Plaintiffs do not assert that Defendants violated the False Claims Act by "petitioning" the government -- that is, by attempting to persuade the United States to purchase their land.

_____

[5] Defendants' efforts to obtain approval of the SYP from the CDF, in contrast, could be considered petitioning activity.

11

United States District Court
For the Northern District of California

Such a claim would arguably be precluded by the Noerr-Pennington doctrine, assuming the negotiations constituted a petition to begin with.  Rather, Plaintiffs assert that Defendants violated the False Claims Act by submitting during the course of the negotiations an SYP in which they presented false information to the United States, and the approval of which had been obtained through committing fraud on the CDF.  Plaintiffs seek to impose liability, not for the act of "petitioning" the government, but for specific acts committed in the course of "petitioning" the government.  This is a critical distinction.  The First Amendment provides that liability generally cannot be imposed on the basis that one has exercised his or her right to petition the government.  It does not provide that liability cannot be imposed for any conduct whatsoever that occurs during the course of petitioning the government.  While citizens have a First Amendment right to petition the government, they do not have a First Amendment right to lie while doing so.  Were it otherwise, application of the False Claims Act itself would, in many cases, be unconstitutional.

Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240 (9th Cir. 1982), demonstrates this point.  In that case, the Ninth Circuit addressed the viability of various antitrust claims based on protests filed with the Interstate Commerce Commission (ICC), an administrative agency that regulated the rates that the plaintiff, a freight forwarder, was permitted to charge.  In order to compete with lower rates offered by unregulated "shipper associations," the plaintiff petitioned the ICC to allow it to lower its rates.  The plaintiff's competitors filed protests with the ICC to prevent the plaintiff from charging

12

the lower rates, which had the potential to draw away their business. The new rates were approved, and the plaintiff sued its competitors for antitrust violations.

The plaintiff in Clipper Express relied on three different theories of antitrust liability. First, it alleged that the defendants unlawfully interfered with competition by protesting the new rates. To avoid application of Noerr-Pennington immunity, the plaintiff asserted that the protests were shams lacking any legal basis and were filed solely for the purpose of restricting competition. Second, the plaintiff alleged that the defendants were liable for antitrust violations under the Walker Process doctrine for attempting to influence ICC action by supplying the agency with fraudulent information. This doctrine, which originated in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172 (1965), "extends antitrust liability to one who commits fraud on a court or agency to obtain competitive advantage." Clipper Express, 690 F.2d at 1247. Third, the plaintiff "contended that the protests were simply part of a larger independent antitrust violation." Id.

The Clipper Express court discussed the applicability of the sham exception to Noerr-Pennington immunity with respect to the first claim. It concluded that the exception applied because the defendants' protests with the ICC were "spurious, baseless, and prosecuted without regard to their merit, intended only to delay competitive action, not to influence governmental action." Id. at 1253.

The court then addressed, as a separate matter, whether antitrust liability could be constitutionally imposed under the

13

Walker Process doctrine for supplying the ICC with false information.  The court noted that administrative proceedings are distinct from the political sphere, where debate can "accommodate false statements and reveal their falsity."  Id. at 1261.  Because supplying administrative agencies with false information "threatens the fair and impartial functioning of these agencies," the court reasoned, such conduct does not deserve First Amendment immunity from the antitrust laws.  Id.  Accordingly, the court held, "There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body.  The first amendment has not been interpreted to preclude liability for false statements."  Id.  In so holding, the court did not craft a new exception to Noerr-Pennington immunity.  Rather, the court established that Noerr-Pennington immunity does not protect the act of making false statements in the first place.

Although Clipper Express addressed the scope of protection, under the Noerr-Pennington doctrine, afforded false statements that are alleged to violate the antitrust laws, there is no reason why the scope of constitutional protection would differ with respect to false statements that are alleged to violate the False Claims Act.  Similarly, although Clipper Express addressed false statements made to an agency acting in an adjudicatory capacity, the false statements at issue here threatened the United States' ability to make an informed decision on a matter of interest to the public, and were not made in a sphere where debate was likely to reveal their falsity.  Accordingly, Clipper Express is dispositive of the present motion.  Here, as in that case, Defendants allegedly "knew the falsity of their statements, and made those statements in a

14

deliberate attempt to mislead" the United States into believing
that their remaining holdings would be sustainably harvested.  <u>Id.</u>
Accordingly, the First Amendment offers Defendants no protection
from liability under the False Claims Act.

Defendants dispute that <u>Clipper Express</u> is applicable to the
present case and assert that there is "no exception to the <u>Noerr-</u>
<u>Pennington</u> doctrine for false statements."  This assertion over-
simplifies the relationship between false statements and <u>Noerr-</u>
<u>Pennington</u> immunity.  Although Defendants cite a number of cases
involving application of the <u>Noerr-Pennington</u> doctrine when the
defendant is alleged to have made false statements, those cases
involve harm flowing from the very <u>act of petitioning</u> the
government.  Where the cases discuss the issue of false statements,
it is in the context of determining whether such statements are
sufficient to render the petition a sham, thereby removing the act
of petitioning from the realm of First Amendment protection.  As
discussed above, when false statements are made in the course of
judicial or other adjudicative proceedings, the petition can be
deemed a sham only if "a party's knowing fraud upon, or its
intentional misrepresentations to" the court or agency deprive the
proceedings of their legitimacy.  <u>Sosa</u>, 437 F.3d at 939.  The cases
do not, as Defendants assert, hold that misrepresentations to the
government are themselves protected by the First Amendment; they
hold merely that, unless the misrepresentations strip the
underlying petition of legitimacy, <u>Noerr-Pennington</u> immunity
continues to protect the act of petitioning.

Assuming for the purpose of this discussion that Defendants'
business negotiations with the United States constituted a

15

petition, the sham exception is not relevant here.  Plaintiffs do not need to demonstrate that Defendants' "petitioning" activities were a sham because they do not seek to impose liability for engaging in those activities.  The act for which Plaintiffs seek to impose liability -- submitting to the United States an SYP containing false statements and approved by the CDF under false pretenses -- is not protected by the <u>Noerr-Pennington</u> doctrine in the first place, as <u>Clipper Express</u> makes clear.  It is therefore neither necessary nor possible to determine whether an exception to the doctrine applies to Defendants' conduct.

A closer look at the specific cases cited by Defendants demonstrates that Defendants' alleged conduct with respect to the SYP, even if it occurred within the context of petitioning activity, is not protected by the First Amendment.  In <u>Kottle v. Northwest Kidney Centers</u>, 146 F.3d 1056 (9th Cir. 1998), the Ninth Circuit addressed an antitrust claim based on the defendant's opposition to the plaintiff's application to a state agency for approval to build two kidney dialysis centers.  The defendant, the only provider of kidney dialysis services in the area, "aggressively opposed" the plaintiff's application "using methods and means which were improper and unlawful," including making false statements and misrepresentations to the agency.  <u>Id.</u> at 1058.  The court held that the "lobbying effort designed to influence [the] state administrative agency's decision . . . [was] within the ambit of the [<u>Noerr-Pennington</u>] doctrine."  <u>Id.</u> at 1059.  When the court discussed the significance of the defendant's misrepresentations to the agency, it was in the context of the sham exception.  It found that the exception did not apply because the plaintiff's

**United States District Court**
For the Northern District of California

allegations of misrepresentations were too vague to demonstrate
that the agency proceedings had been stripped of their legitimacy.
Id. at 1063-64.  Unlike Plaintiffs here, the plaintiff in Kottle
charged the defendant with liability for engaging in petitioning
activity.  Thus, the court had no opportunity to consider whether
the defendant could have been held liable for the independent act
of making false statements to the agency.

Liberty Lake Investments, Inc. v. Magnuson, 12 F.3d 155 (9th
Cir. 1993) is similarly inapplicable to the present case.  In
Liberty Lake, the defendant had allegedly initiated baseless
litigation, in violation of the antitrust laws, challenging on
environmental grounds the plaintiff's plan to build a shopping
center.  As in Kottle, the court's discussion of fraud and
misrepresentation focused on the sham exception and whether the
litigation had been deprived of its legitimacy.  Id. at 159.  This
discussion is not relevant here, where the sham exception is
inapposite because the challenged activity is not protected by
Noerr-Pennington immunity to begin with.  Similarly, Oregon Natural
Resources Council v. Mohla, 944 F.2d 531 (9th Cir. 1991), and Omni
Resource Development Corp. v. Conoco, Inc., 739 F.2d 1412 (9th Cir.
1984), both involved attempts to impose liability based on the
initiation of litigation.  In Mohla, the counter-claim plaintiff
alleged that the counter-claim defendant had interfered with the
former's business relations by filing a lawsuit to enjoin it from
logging a tract of national forest land.  In Omni, the plaintiff
charged the defendant with violating the antitrust laws by pursuing
a trespass lawsuit in state court to prevent the plaintiff from
conducting mining operations.  In both cases, the plaintiff sought

United States District Court
For the Northern District of California

to impose liability for the act of petitioning and the court's discussion of misrepresentations focused on the applicability of the sham exception.  Mohla, 944 F.2d at 535-36; Omni, 739 F.2d at 1414-15.  Notably, in Omni, the court's finding that the lawsuit was not a sham was based on the fact that "nothing more [was] alleged than the use of false affidavits in the state suit."  739 F.2d at 1414.  Although filing false affidavits was not sufficient to render the litigation a sham, it goes without saying that liability could nonetheless be imposed for the act of submitting a false affidavit to a court.

In Boone v. Redevelopment Agency of San Jose, 841 F.2d 886 (9th Cir. 1988), a developer was alleged to have violated the antitrust laws by conspiring with city officials to amend a redevelopment plan in a way that would drive down the value of its competitors' buildings.  Although the antitrust claim in Boone was not based on the initiation of litigation as in the cases just discussed, the plaintiffs nonetheless sought to impose liability on the developer based on the fact that it had petitioned the government.  The court found that the city officials and the redevelopment agency responsible for the plan "were carrying out essentially legislative tasks in amending the plan."  Id. at 896. Because the amendment process operated in the political realm, where misrepresentations are commonplace, the misrepresentation was not sufficient to remove Noerr-Pennington immunity from the lobbying efforts.  Id. at 896-97.  While Boone held that antitrust liability could not be imposed for engaging in those efforts, the case did not address whether liability could be imposed under a statute that made it independently unlawful to make

18

United States District Court
For the Northern District of California

misrepresentations to the redevelopment agency or to city officials.  Thus, <u>Boone</u> does not address the issue before the Court.  Moreover, even if <u>Boone</u> is read to stand for the proposition that liability could not be imposed for making such misrepresentations, the facts in <u>Boone</u> are not similar to those here.  Defendants are not alleged to have made false statements in the course of lobbying a legislative body.  The tolerance afforded to lobbying of the type described in <u>Boone</u> is premised on the notion that debate in the political realm is capable of exposing misrepresentations.  No such tolerance is warranted here.

It is true that conduct that is "incidental" to a petition is protected under the First Amendment.  However, no case cited by Defendants has extended immunity to anything more than the <u>act</u> of engaging in incidental conduct.  In <u>Sosa v. DIRECTV, Inc.</u>, 437 F.3d 923 (9th Cir. 2006), the Ninth Circuit considered whether the defendant could be held liable under the Racketeer Influenced and Corrupt Organizations Act for sending a pre-litigation demand letter.  The court extended <u>Noerr-Pennington</u> immunity to the act of communicating settlement demands prior to initiating actual litigation because such communication is incidental to the litigation.

In <u>Freeman v. Lasky, Haas & Cohler</u>, 410 F.3d 1180 (9th Cir. 2005), the Ninth Circuit addressed whether the defense of a lawsuit could serve as the basis of an antitrust claim where the defendants committed discovery misconduct, including subornation of perjury and intimidation of witnesses, that allegedly had an anti-competitive effect.  The court noted that discovery is "incidental" to a petition, and thus is entitled to protection under the <u>Noerr-</u>

United States District Court
For the Northern District of California

Pennington doctrine.  Nonetheless, Freeman did not purport to immunize all discovery conduct from sanctions; the court's analysis demonstrates that it was concerned with whether antitrust liability could be imposed for the act of defending the lawsuit, not with whether the specific instances of discovery misconduct were entitled to protection in and of themselves.  In evaluating the applicability of the "baseless litigation" prong of the sham exception, the court focused on whether the defense as a whole was baseless, and therefore not entitled to First Amendment protection; it noted that whether "particular misconduct violates the Sherman Act depends on whether the defense as a whole would be actionable." Id. at 1185.  The court did not suggest that the discovery misconduct, which allegedly involved criminal acts, could not constitutionally be penalized.  Similarly, in discussing whether misrepresentations allegedly made to the court eliminated Noerr-Pennington immunity under the "fraud or misrepresentations" prong of the sham exception, the court evaluated whether the misrepresentations were severe and persuasive enough to deprive the proceedings of their legitimacy.  The court stated, "Our conclusion that the defense as a whole was not a sham also establishes that this isolated instance of litigation misconduct would not, if proven, deprive the defense as a whole of its legitimacy." Id. at 1185 n.2.  This passage further emphasizes that the Freeman court treated the conduct for which the plaintiff sought to impose liability as the act of defending the lawsuit, not the act of making misrepresentations to the court in the course of defending the lawsuit.  Importantly, the Ninth Circuit did not suggest that the defendants' First Amendment right would be violated by the

imposition of sanctions for committing discovery misconduct or for the act of making misrepresentations to the court.  In fact, the court noted without comment that the district court had imposed sanctions for discovery misconduct.  Id. at 1185.

Defendants have not cited any case in which the Ninth Circuit or the Supreme Court has held that liability cannot be imposed for submitting a false statement to the government in the course of petitioning it.[6]  Moreover, Defendants' implicit position -- that, once an individual has initiated petitioning activity, any conduct whatsoever taken in the course of that activity is out of the law's reach -- is simply untenable.  The First Amendment does not grant individuals the unbridled right to do whatever they like so long as it takes place in the context of petitioning the government. Parties to litigation are not allowed to perjure themselves on the witness stand.  Lobbyists do not have a constitutional right to bribe legislators.  Contractors may not submit falsified safety reports when applying for building permits.  Drivers are not entitled to file forged smog certificates when registering their vehicles.

The Court is aware that the San Francisco Superior Court, relying on the decision of the California Court of Appeal in Gallegos, reached a different conclusion with respect to the application of the Noerr-Pennington doctrine to the claim against Pacific Lumber under the California False Claims Act.  However, Gallegos involved a claim under California's Unfair Competition

---

[6]The Court again notes that Defendants did not petition the United States, but merely engaged in negotiations for a real estate transaction.

United States District Court
For the Northern District of California

Law.  The appeals court was not concerned simply with Defendants'
alleged false statements to the CDF, but with Defendants' overall
efforts to obtain approval of the SYP.  The Superior Court did not
distinguish the claim under the California False Claims Act from
Gallegos on this basis; it did not address the fact that the
plaintiff was not seeking to impose liability on Pacific Lumber for
engaging in lobbying activity.  The court's discussion of the sham
exception and its focus on the protection afforded to petitioning
activity in general are not relevant to this case.  The Court
respectfully disagrees with the reasoning of the Superior Court to
the contrary.

At oral argument, Defendants requested leave to file an
interlocutory appeal should the Court deny their motion.  A
district court may certify appeal of interlocutory orders only if
three factors are present.  First, the issue to be certified must
involve a "controlling question of law." 28 U.S.C. § 1292(b).
Second, there must be "substantial ground for difference of
opinion" on the issue.  Id.  Third, it must be likely that an
interlocutory appeal will "materially advance the ultimate
termination of the litigation." Id.

The application of the Noerr-Pennington doctrine is a
controlling question of law in that Plaintiffs may not pursue their
claim if it applies.  Because Plaintiffs assert only one claim, an
interlocutory appeal, if successful, would likely advance the
ultimate termination of this litigation.  However, if the appeal
were to fail, the termination of the litigation would be delayed,
and the Court of Appeals would be burdened with a second appeal.
In addition, the Court finds that the grounds for difference of

22

opinion on the issue presented are not substantial enough to justify an interlocutory appeal.  Although the Superior Court found that the <u>Noerr-Pennington</u> doctrine shields Defendants' conduct, no precedent binding on this Court suggests that the doctrine should be extended in such a manner.

CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for judgment on the pleadings.[7]

IT IS SO ORDERED.

Dated: 2/9/09

_____
CLAUDIA WILKEN
United States District Judge

_____

[7]The Court overrules as moot Defendants' objections to the Maranto declaration.  The Court did not rely on the declaration in reaching its decision.  The Court grants Defendants' request for judicial notice of the state court's order granting their motion for judgment on the pleadings and the transcript of the associated proceedings.  The request is denied in all other respects.

**United States District Court**
For the Northern District of California