United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA ex rel.
RICHARD WILSON and CHRIS MARANTO,

        Plaintiffs,

    v.

MAXXAM, INC., et al.,

        Defendants.
_____/

No. C 06-7497 CW

ORDER DENYING
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
AND GRANTING IN PART
DEFENDANTS' MOTION
TO EXCLUDE NEW
ALLEGATIONS OF FRAUD

    This is a qui tam action filed under the False Claims Act by Plaintiffs/Relators Richard Wilson and Chris Maranto, on behalf of the United States, based upon allegations that Defendants made false statements to the California Department of Forestry and Fire Protection (CDF) in a sustained yield plan, the approval of which caused the United States to contribute $250 million toward the purchase of the Headwaters Forest.  The United States has declined to intervene in this action.  Defendants Maxxam Inc. and Charles E. Hurwitz[1] now move for summary judgment and to exclude what they

_____

[1]Defendants Pacific Lumber Company, Scotia Pacific Company LLC and Salmon Creek LLC filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas.  The bankruptcy action
(continued...)

characterize as new allegations of fraud.  Plaintiffs oppose the motions.  The matter was heard on February 19, 2009.  Having considered oral argument and all of the papers submitted by the parties, the Court denies the motion for summary judgment and grants in part the motion to exclude.

BACKGROUND

The origins of this case date back to late 1985, when Hurwitz, described by Plaintiffs as a "corporate raider," initiated Maxxam's takeover of the Pacific Lumber Company.[2]  Hurwitz controls a majority of Maxxam's stock and combined voting power.  As a result, Mr. Hurwitz allegedly is "able to control the election of the Company's Board of Directors and controls the vote on virtually all matters which might be submitted to a vote."  Compl. ¶ 38.

Included in Pacific Lumber's land was the Headwaters Forest, the largest privately owned old-growth redwood forest in the United States.  According to Plaintiffs, Pacific Lumber had carefully managed its redwood forests before its takeover.  However, Maxxam's purchase of Pacific Lumber was highly leveraged, and Plaintiffs allege that its priority was not long-term sustainability, but short-term profits.  Maxxam soon announced that it would escalate Pacific Lumber's logging of old-growth timber to pay off its debt. Pacific Lumber's conservative forest practices became a thing of the past, according to Plaintiffs.  The company's new direction

---

[1](...continued)
has been resolved, and these Defendants have been, or are being, dissolved and their assets transferred to other entities.  They do not join in the present motion.  All references to "Defendants" in this order are to Hurwitz and Maxxam only.

[2]Scotia Pacific Company LLC and Salmon Creek LLC were wholly owned subsidiaries of Pacific Lumber.

United States District Court
For the Northern District of California

under Maxxam's control caused a great deal of public controversy and led to highly publicized protests.

In the 1990s, Pacific Lumber was enjoined from harvesting old-growth timber that served as a habitat for the marbled murrelet, an endangered species of bird. It responded by suing both the state and federal governments, arguing that the enforcement of the Endangered Species Act constituted an unlawful taking of its property. To resolve this dispute and quell the controversy over Pacific Lumber's aggressive forestry practices, Maxxam, Pacific Lumber, the State of California and the United States entered into a complex agreement. Pursuant to the agreement, Pacific Lumber agreed to dismiss its pending lawsuits and to sell the Headwaters Forest and another property known as the Elk Head Springs Forest to the United States. Headwaters would become a public wildlife reserve. In exchange, the government would purchase land adjacent to the Headwaters Forest, then owned by the Elk River Timber Company, for approximately $80 million. It would retain ownership of the land nearest Headwaters to serve as a "buffer zone" and transfer the rest to Pacific Lumber. The United States would pay Pacific Lumber $300 million in cash. California was required to contribute $130 million toward the total purchase price of $380 million and, in exchange, would receive a conservation easement on the Headwaters property and the right to participate in management of the forest.

The agreement specified several conditions that had to be satisfied before the Headwaters purchase would be consummated. One was the issuance of an incidental take permit to Pacific Lumber, which would permit it to conduct operations resulting in the

3

incidental take of endangered or threatened species on its retained land.  This required the federal government's approval of a Habitat Conservation Plan (HCP) for the land.

Another condition was approval of a sustained yield plan (SYP) for the retained land "in a form and substance satisfactory to Pacific Lumber."  Wilson Dec. Ex. 2 § 6(b).  An SYP "is a kind of master plan for logging a large area, authorized by statute and regulation, designed to achieve the [California] Forest Practice Act's objective of obtaining the maximum timber harvest consistent with various short- and long-term environmental and economic objectives."  Envtl. Prot. and Info. Ctr. v. Cal. Dep't of Forestry and Fire Prot. (EPIC), 44 Cal. 4th 459, 471 (2008).  In EPIC, which involved a challenge to the same SYP that is the subject of this case, the California Supreme Court explained the role of an SYP in the overall regulatory framework applicable to forestry operations:

> A proper understanding of the nature and purpose of Sustained Yield Plans for timber harvesting begins by placing them in the context of the Forest Practice Act. The Act's provisions, together with implementing rules and regulations promulgated by the State Board of Forestry (board), provide a comprehensive scheme regulating timber operations in a way which promotes the legislative goal of achieving maximum sustained production of high-quality timber products while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment.  The heart of the scheme is its requirement that logging be carried out only in conformance with a timber harvesting plan (THP or plan) submitted by the timber owner or operator and approved by the department after determining, with an opportunity for input from state and county agencies and the general public, that the proposed operations conform to the Act and rules and regulations.  Since 1976, the THP preparation and approval process developed under the Act has been certified as the functional equivalent to, and hence an adequate substitute for, the full environmental impact

report (EIR) process required by CEQA.

As part of fulfilling the Forest Practice Act's goals, the Legislature has authorized the Board of Forestry and Fire Protection to create rules and regulations for the development of Sustained Yield Plans.  The SYP is intended to serve as a kind of master plan for timber harvesting a large geographic area.  The board's regulations . . . declares [sic]: "This Article carries out the Legislature's direction that the Board adopt regulations to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish and wildlife, and water resources in accordance with the policies of the Act. Those policies include creating and maintaining a system of timberland regulations and use which ensures that timberland productivity is maintained, enhanced and restored where feasible and the goal of maximum sustained production of high-quality timber products is achieved while giving consideration to environmental and economic values.  The Sustained Yield Plan (SYP) may be submitted at the option of the landowner and is intended to supplement the THP process by providing a means for addressing long-term issues of sustained timber production, and cumulative effects analysis which includes issues of fish and wildlife and watershed impacts on a large landscape basis."  Under the Forest Practice Rules, a SYP "shall not replace a THP.  However, to the extent that sustained timber production, watershed impacts and fish and wildlife issues are addressed in the approved SYP, these issues shall be considered to be addressed in the THP; that is the THP may rely upon the SYP."

Forest Practice Rules section 1091.45, subdivision (a) further elaborates on the SYP requirements: "Consistent with the protection of soil, water, air, fish and wildlife resources a SYP shall clearly demonstrate how the submitter will achieve maximum sustained production of high quality timber products while giving consideration to regional economic vitality and employment at planned harvest levels during the planning horizon.  The average annual projected harvest over any rolling 10-year period, or over appropriately longer time periods for ownerships which project harvesting at intervals less frequently than once every 10 years, shall not exceed the long-term sustained yield estimate for a SYP submitter's ownership."  Forest Practice Rules section 1091.3 defines "Planning Horizon" as the "100 year period over which sustained timber production, watershed, and fish and wildlife effects shall be evaluated."  The Forest Practice Rules also require "an estimate of the long term sustained yield."

Thus, the SYP is a kind of master plan for timber

United States District Court
For the Northern District of California

harvesting over a long time period that supplements but
does not replace the THP process, and individual THP's
may rely on the SYP to the extent it analyzes the
pertinent issues.

44 Cal. 4th at 481-82 (citations, additional internal quotation
marks and alterations omitted).

The Headwaters Agreement provided:

Pacific Lumber will submit to the State of California a
proposed SYP, which (I) covers the Resulting Pacific
Lumber Timber Property, and which the Parties agree will
be amended to include any timberlands or timber
harvesting rights received by Pacific Lumber in exchange
for the Headwaters Forest and Elk Head Forest, including
Exchanged Elk River Property, and (II) complies with
terms and specifications to be agreed upon by Pacific
Lumber and California as soon as practicable, such
agreement to be evidenced by an Instrument in form and
substance satisfactory to Pacific Lumber and California
. . . . Such SYP shall provide for management and
harvest, consistent with applicable and [sic] legal
requirements, of all the Resulting Pacific Lumber Timber
Property and shall be with respect to the marbled
murrelet, the coho salmon, the northern spotted owl and
all other species specifically or generally identified in
the SYP (whether now or hereafter listed as threatened or
endangered under the laws of the United States or
California). The State of California shall use its best
efforts to review and approve the SYP.

Wilson Dec. Ex. 2 ¶ 1(c)(iii)(F).

In 1997, Congress authorized the appropriation of $250 million
as its share of the $380 million purchase price. It provided,
however, that the authorization would become effective only when
the conditions specified in the agreement had been met, including
the condition that "the State of California approve[] a Sustained
Yield Plan covering Pacific Lumber Company timber property." 16
U.S.C. § 471j(b)(2).

Pacific Lumber developed a joint document to serve as both the
HCP and the SYP. The SYP included different "alternatives":
Alternative 25a provided for an average annual harvest of 136

6

**United States District Court**
For the Northern District of California

million board feet; Alternative 25, which Pacific Lumber preferred, provided for a permissible harvest of 178.8 million board feet per year.  In February, 1999, the CDF approved Alternative 25a.  In response, Hurwitz threatened to cancel the sale of Headwaters.  The United States Fish and Wildlife Service encouraged the CDF to approve Alternative 25.  On March 1, 1999, Plaintiff Wilson, then Director of the CDF, approved Alternative 25.  The Headwaters Agreement was subsequently consummated.

At the time of the approval, Wilson believed that the SYP relied on sound assumptions and represented a reasonably accurate projection of growth and harvest.  Plaintiffs allege that the SYP was actually fraudulent in multiple respects.  For example, the SYP model relied on hardwoods to satisfy residual stocking requirements following the harvest of conifers.  This made it appear that the conifer harvests were sustainable when, in reality, they would result in the impermissible conversion of conifer stands to hardwood stands.  Moreover, even with the inclusion of hardwoods, the residual stocking levels provided in the SYP fell below what was permissible under Forest Practice Rules.  In addition, the computer models that were actually used to predict growth and harvest differed from what was described in the SYP and were not consistent with sound principles of forestry.  This further inflated the conifer harvest forecast.  The SYP also failed to comply with harvest limitations resulting from adjacency to areas that had been clear-cut.

According to Plaintiffs, truthful disclosure of growth and yield in the SYP would have resulted in an annual harvest of approximately ninety to 125 million board feet per year, far less

7

United States District Court
For the Northern District of California

than the 178 million that Maxxam needed in order to pay off its substantial debt. Plaintiffs allege that it was this debt, and not legitimate principles of long-term sustainability, that drove the models used to create the SYP. Plaintiffs estimate that, by intentionally manipulating the SYP, Pacific Lumber increased its harvest forecasts by approximately thirty percent.

Questions began to arise concerning the validity of Pacific Lumber's yield projections in 2001. In November of that year, Plaintiff Maranto, a CDF Sustained Yield Forester, was assigned to review a long-term THP for 8,000 acres of land (the Eel River land) Pacific Lumber had purchased after the Headwaters sale. Maranto discovered a number of errors with the THP, including its use of hardwoods to meet residual stocking requirements and various inconsistencies between Pacific Lumber's modeling outputs and the written presentation of the models. He also came to believe that Pacific Lumber had fabricated 200 million board feet of inventory for the purpose of inflating yield, and that the THP did not reflect Pacific Lumber's actual harvesting practices. Maranto eventually learned that Pacific Lumber had used the same modeling methodology to create the SYP that it had used to create the Eel River THP. In the summer of 2004, he concluded that the SYP likely had been "intentionally skewed with a view to inflating the permissible timber harvest." Compl. ¶ 131.

In July, 2006, Wilson called Maranto to inquire about the SYP modeling. Plaintiffs met the next month. Maranto told Wilson he believed that Pacific Lumber's SYP was false because it was based on a flawed and distorted modeling methodology. Collectively, the two concluded that Defendants had defrauded the United States

government by submitting a fraudulently modeled SYP in order to obtain $250 million in federal funds for the Headwaters Forest deal.

Plaintiffs filed this lawsuit in December, 2006, asserting claims under the federal False Claims Act based on the false statements contained in the SYP.  Defendants now move for summary judgment on the grounds that: 1) there is no evidence that the SYP was material to the United States; 2) there is no evidence that the United States was damaged by any falsity in the SYP; 3) there is no evidence that the SYP was false; and 4) the action is barred by the statute of limitations.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

United States District Court
For the Northern District of California

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it

10

must produce affirmative evidence of such negation.  <u>Nissan</u>, 210
F.3d at 1105.  If the moving party produces such evidence, the
burden then shifts to the non-moving party to produce specific
evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of
production by either method, the non-moving party is under no
obligation to offer any evidence in support of its opposition.  <u>Id.</u>
This is true even though the non-moving party bears the ultimate
burden of persuasion at trial.  <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue
at trial, it must, in order to discharge its burden of showing that
no genuine issue of material fact remains, make a <u>prima facie</u>
showing in support of its position on that issue.  <u>UA Local 343 v.
Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994).  That
is, the moving party must present evidence that, if uncontroverted
at trial, would entitle it to prevail on that issue.  <u>Id.</u>  Once it
has done so, the non-moving party must set forth specific facts
controverting the moving party's <u>prima facie</u> case.  <u>UA Local 343</u>,
48 F.3d at 1471.  The non-moving party's "burden of contradicting
[the moving party's] evidence is not negligible."  <u>Id.</u>  This
standard does not change merely because resolution of the relevant
issue is "highly fact specific."  <u>Id.</u>

DISCUSSION

I.   Materiality

To succeed on a claim under the False Claims Act, a plaintiff
must demonstrate that "the defendant intended that the false record
or statement be material to the Government's decision to pay or
approve the false claim."  <u>Allison Engine Co., Inc. v. U.S. ex rel.</u>

United States District Court

For the Northern District of California

<u>Sanders</u>, ___ U.S. ___, 128 S. Ct. 2123, 2126 (2008).  It is not enough simply to show that the false statement was one of many "but for" factors that ultimately "resulted in obtaining or getting payment or approval of the claim."  <u>Id.</u>  Rather, the false statement must be directly linked to the government's decision.

Defendants argue that the SYP was not material to the government's decision to purchase the Headwaters Forest.  Their argument is based primarily on the fact that the Headwaters Agreement was entered into in 1996 and Congress appropriated funds for the purchase in 1997, before the SYP had been completed.  However, the fact that the SYP was not approved until later is not fatal to Plaintiffs' claim.  The Headwaters Agreement specifically conditioned the purchase on the approval of an SYP by the State of California.  Future approval of the SYP was a material event that was directly linked to the deal's consummation -- and thus the government's payment of $250 million -- not simply an incidental "but for" cause.  It makes no difference that the agreement did not depend on the specific content of the SYP.  The agreement clearly conditioned the Headwaters purchase on Defendants' harvesting their remaining holdings pursuant to an approved SYP.  It can be inferred that the United States expected that the approval would not be obtained through fraud.  The fact that the United States itself would not be directly involved in the approval process does not indicate that it was unconcerned with the legitimacy of the SYP; it indicates only that the United States was willing to let California determine whether the plan truly embodied sustainable harvesting practices.

Although the approval of an SYP was a material <u>event</u>,

12

Defendants dispute that the condition was material <u>to the government</u>.  The agreement does not reveal whether the provisions relating to the SYP were included for the benefit of the government or for the benefit of Pacific Lumber -- or, as is likely, for the benefit of <u>both</u> parties.  The fact that the SYP was required to be "in a form and substance satisfactory to Pacific Lumber" and applied to the land Pacific Lumber would retain suggests that Defendants wanted to reserve the right to cancel the deal if they could not obtain approval of an SYP that would permit them to harvest their retained holdings at a profitable level.  In fact, this scenario nearly came to pass: Hurwitz threatened to scuttle the purchase if the CDF approved the SYP's Alternative 25a rather than Alternative 25.  In addition, having an SYP in place would permit Pacific Lumber to rely on the yield projections therein when seeking approval of future THPs, thus providing a measure of assurance that it would be permitted to embark on specific harvest projects so long as they comported with the provisions of the SYP.

On the other hand, Pacific Lumber's aggressive and allegedly unsustainable approach to harvesting its timber holdings had caused an extreme amount of public controversy by the time the Headwaters Agreement was negotiated.  Although most of the controversy centered on Pacific Lumber's plans to harvest the Headwaters Forest, the health of its retained holdings, which included a number of old growth stands that provided habitat for the marbled murrelet, was also a matter of ongoing concern.  The Department of the Interior's Record of Decision for the purchase reflects this fact.  It demonstrates that the purchase of Headwaters was part of an overall "project," the objectives of which included not just

**United States District Court**
For the Northern District of California

1  "permanent protection for the Headwaters Forest," but also

2  "sustained production of timber products, consistent with federal

3  and state laws, on lands owned by [Pacific Lumber]" and reduction

4  of "public controversy regarding [Pacific Lumber's] management of

5  its timberlands, particularly the Headwaters Forest."  Defs.' Req.

6  for Judicial Notice Ex. A at 2.  The SYP furthered these latter two

7  objectives by ensuring that Pacific Lumber's land would be

8  harvested at a sustainable level.

9      The Court concludes that a reasonable jury could find that the

10  approval of a legitimate SYP was material to the United States'

11  decision to purchase Headwaters from Defendants.

12  II.  Damages

13      A person is liable under the False Claims Act for a civil

14  penalty of up to $10,000 "plus 3 times the amount of damages which

15  the Government sustains because of the act of that person."  31

16  U.S.C. § 3729(a)(7).  Defendants argue that, even if the SYP was

17  material to the United States' decision to authorize the Headwaters

18  purchase and was fraudulent, the United States did not suffer any

19  damage as a result because it received land that was later

20  appraised at between $135 million and $405 million,.

21      The damage issue is closely related to the materiality issue.

22  Ordinarily, the measure of damages under the False Claims Act is

23  the difference between what the government paid on the fraudulent

24  claim and what it would have paid absent the misrepresentation.

25  United States v. Woodbury, 359 F.2d 370, 379 (1966).  Because a

26  jury could reasonably conclude that approval of a legitimate SYP

27  was material to the United States, it follows that a jury could

28  reasonably conclude that Defendants caused the United States to pay

14

**United States District Court**
For the Northern District of California

$250 million that it would have not have paid if it had known that the SYP was fraudulent.  A jury may therefore find that the United States was damaged in the amount of $250 million.  Alternatively, a jury may conclude that, because the government received the Headwaters Forest in exchange for its payment, it would not be appropriate to assess the entire $250 million against Defendants as damages.  Instead, the jury may decide to award a lesser amount based on its determination of the value of the SYP to the United States.

Plaintiffs cannot be expected, as Defendants contend, to demonstrate that the United States would have paid a specific lesser amount for Headwaters if it knew of the fraud.  The deal was not structured in a way that lends itself to division of the consideration paid by the United States; the sale of Headwaters and the condition that Defendants obtain an SYP were intertwined.  One would not expect there to be evidence of what the United States would have paid for Headwaters in a counterfactual scenario -- i.e., if it had received only the Headwaters Forest but no assurance that Pacific Lumber would log the rest of its land sustainably.  Plaintiffs' inability to come forward with such evidence does not support a finding that the United States was not damaged.

The issue of damages is one for the jury.  And, in any event, because Defendants would be subject to civil penalties even if the jury finds that the United States was not damaged by Defendants' fraud, Defendants' success on this issue would not obviate the need for a trial.

III. Falsity of the Statements

Defendants argue that there is no evidence that the SYP was obtained by providing false information or concealing material information from the CDF.  In their summary judgment motion, they attempt to show an absence of triable issues of fact with respect to one aspect of the alleged fraud only: the inclusion of hardwoods to meet residual stocking levels after conifer harvests.  In support of their position, they rely principally on a document entitled "Sufficiency Review Comments and Answers" dated April 1, 1997, which contains the following passage:

LTSY Species:

What species are included in the LTSY estimate? (CDF)

> The species in the site quality table on page 6 of
> the appendix A are included in the LTSY estimate.

Are group B species[3] to be considered for stocking in any of the silvicultural prescriptions? (CDF)

> Any of the group B Species in the site quality table
> on page 6 may be counted for stocking.

If so, which ones and to what extent? (CDF)

> We will always count group B species for stocking in
> [Watercourse and Lake Protection Zones] and
> occasionally in other Silvicultural prescriptions if
> the [Registered Professional Forester] thinks it is
> appropriate.

Defs.' Req. for Judicial Notice Ex. K at CDF-119459 (formatting altered and numbering removed for clarity).

To begin with, this does not establish that Defendants disclosed that they relied on hardwoods to meet stocking requirements as a general matter; it shows that they disclosed the

---

[3] "Group B" species are hardwoods; "Group A" species are conifers.

16

routine use of hardwoods to meet stocking requirements in Watercourse and Lake Protection Zones only. They represented that only in exceptional cases would hardwoods be used to satisfy stocking requirements in other silvicultural prescriptions.

Moreover, Defendants' responses to the above questions were rejected. Plaintiffs point to a draft[4] of a July, 1997 document containing a reply, apparently from the CDF, to those responses:

> The answer does not adequately address the question. The questions attempt to establish, for the harvest schedule modelling [sic] in this SYP, the silvicultural prescriptions in which Group B species were used to meet stocking, and how many acres of these prescriptions were included in this SYP. Please provide a list of the prescriptions on page K-7 to K-23 that rely on group B species to meet the stocking requirements of the Forest Practice Rules, and the amount of acres allocated to these prescriptions.

Wilson Dec. Ex. 14 at HWQT10641. This response demonstrates that Defendants' use of hardwoods to meet stocking requirements was a matter of concern to the CDF. Nonetheless, it does not appear that Defendants provided the information that was sought, see Wilson Dec. Ex. 15 at 129, and later versions of the SYP did not address the hardwoods issue.

Defendants note that Helge Eng, a CDF employee who was involved in reviewing the SYP at the time Defendants sought approval, stated during his deposition that he believed Defendants and the CDF subsequently came to some sort of an understanding regarding how hardwoods would be used in the modeling protocols. Washburn Dec. Ex. C at 126-27; 157. However, Eng's testimony on this point is vague and, in any event, other people involved in

---

[4]It is not clear whether the final reply differed from the draft.

United States District Court
For the Northern District of California

reviewing the SYP -- including Plaintiff Wilson when he approved it -- were not aware that hardwoods were being used.

In short, the responses quoted above and Eng's hazy recollection of some discussion of hardwoods do not demonstrate an absence of triable issues concerning whether Defendants disclosed the methodology that forms the basis of Plaintiffs' fraud allegations.  Defendants therefore have not established that they are entitled to judgment as a matter of law.[5]

IV.  Statute of Limitations

An action brought under the False Claims Act must be brought within six years of the date of the violation or within three years of the date "when facts material to the right of action are known or reasonably should have been known," whichever occurs later.  31 U.S.C. § 3731(b).  Defendants argue that, according to Plaintiffs' own allegations, Maranto learned of Defendants' claimed fraud in 2001 or 2002.  But the allegations to which Defendants refer, contained in ¶¶ 110-117 of the complaint, discuss the course of Maranto's discovery of the infirmities in the THP for the Eel River land, not the SYP that was required by the Headwaters Agreement. It was not until 2004, based on his knowledge of Defendants' manipulations of the Eel River THP and spurred by Defendants' updated inventory, that he says he came to believe the SYP was fraudulent.

Moreover, Maranto asserts that he did not learn that the SYP was a precondition to the United States' purchase of Headwaters

_____

[5]In addition, Defendants have attempted to demonstrate an absence of triable issues of fact with respect to their use of hardwoods only.  Plaintiffs allege that the SYP was fraudulent in other ways as well.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

until he met with Wilson in 2006.   To refute this contention,
Defendants point to an email chain that was forwarded to Maranto
with the message "FYI."   One of the emails in the chain mentions
briefly that the SYP was "a requirement of the federal Headwaters
funding."   Defs.' Req. for Judicial Notice Ex. M at HWQT17008.
There is, however, no evidence that Maranto ever read this email
chain, let alone the relevant portion.   Nor does the fact that the
Environmental Impact Statement from the Headwaters deal was sitting
on a shelf when Maranto moved into his office demonstrate, as
Defendants assert, that he knew or should have known that the SYP
was a material part of the deal.

Defendants also charge Maranto with constructive knowledge of
the terms of the Headwaters Agreement because the terms were
embodied in an act of Congress.   Their basis for this contention is
the maxim that ignorance of the law is no excuse for failing to
comply with it.   But Plaintiffs do not invoke ignorance as an
excuse for violating the law, as in the cases applying the maxim,
and Defendants have cited no case charging anyone with constructive
knowledge of an element of his or her claim because it is reflected
in a particular provision in a large appropriation bill.

The Court concludes that Defendants have not established, as a
matter of law, that this action is barred by the statute of
limitations.

V.   Plaintiffs' New Allegations of Fraud

Defendants assert that Plaintiffs should be estopped from
proceeding on the following allegations of fraud:

1.   Defendants improperly relied on "no harvest" areas to
calculate the long term sustained yield.

19

2.   Yield assumptions were improperly based on data from the Scotia Tree Farm.

3.   The computer model used incorrect "hardwood sprouting" routines.

4.   Defendants based their projection of increased yields on intensive management techniques that the company did not implement.

5.   The process of selecting sites for harvesting did not comply with the Forest Practice Rules.

6.   Defendants improperly modeled a species conversion from redwood to Douglas fir.

7.   Defendants' harvest schedules were based on a flawed inventory that was overstated by approximately one billion board feet.

8.   Defendants overstated growth in the SYP by at least fifty to seventy-five million board feet per year.

9.   Defendants relied on current and future yield tables that were at least three times greater than was actually present on the property.

10.   Defendants used a computer model in the SYP that employed improper linear programming methods.

11.   In the computer model, the regime trigger condition for Regime Code 301 was improperly reduced to 120 basal area.

12.   The computer model's projections were based on clear-cutting in violation of environmental constraints.

According to Defendants, these allegations were not contained in the complaint or disclosed in response to their contention interrogatories, but rather were raised for the first time in

20

United States District Court
For the Northern District of California

Plaintiffs' expert reports, which Defendants received after the
close of fact discovery.  Defendants assert that they will be
prejudiced if Plaintiffs are permitted to proceed under these
theories because Defendants did not have an opportunity to take
fact discovery that is necessary to enable them to refute the
charges.

In responding to Defendants' motion, Plaintiffs emphasize that
they have maintained all along that Defendants manipulated the SYP
for the purpose of satisfying their debt obligations, without
regard to whether the SYP was sound.  This is true, but the
generalized allegation that Defendants manipulated the SYP is
conclusory and is not sufficient to enable Defendants to articulate
a defense.  Defendants cannot be expected to defend against the
charge that they manipulated the SYP unless they know <u>how</u> they are
alleged to have manipulated it.  To the extent allegations of
particular types of fraud were raised for the first time after the
close of fact discovery and cannot be refuted through expert
discovery alone, it would not be equitable to permit Plaintiffs to
proceed on the allegations without first allowing Defendants the
opportunity to take additional fact discovery.

The Court rules on the specific "new" allegations as follows:

1.   Plaintiffs have not specifically addressed their expert's
     contention that Defendants improperly relied on "no
     harvest zones" to meet yield projections.  Because it is
     not clear why such zones were designated as "no harvest,"
     the Court cannot determine whether Defendants' reliance
     on the zones represents a new allegation.  To the extent
     the zones could not be harvested because of adjacency

1   limitations, the allegation relates to matters that were

2   specifically raised in the complaint.  To the extent the

3   zones could not be harvested for some other reason, the

4   allegation may be new.  However, whether the SYP relied

5   on improper use of no harvest zones is an issue that can

6   be resolved through expert discovery alone, and thus the

7   Court will permit Plaintiffs to proceed with it.

8   2.   It is not clear that Plaintiffs raised the improper use

9   of data from the Scotia Tree Farm before the close of

10  fact discovery, and Plaintiffs have not explained how

11  this allegation relates to their claim of fraud as a

12  whole.  However, like Defendants' alleged reliance on no

13  harvest zones, Defendants can refute this allegation

14  through expert discovery.  The Court will therefore

15  permit Plaintiffs to introduce evidence in support of

16  this allegation.

17  3.   Plaintiffs have not explained how Defendants' alleged use

18  of incorrect hardwood sprouting routines relates to their

19  overall claim of fraud.  Again, however, Defendants can

20  refute this allegation through expert discovery and the

21  Court will not preclude Plaintiffs from raising it.

22  4.   Plaintiffs have not demonstrated that they raised the

23  issue of failure to implement intensive management

24  techniques in their complaint or during discovery, and it

25  is not clear how failure to implement practices described

26  in the SYP renders the SYP itself false.  In any event,

27  Defendants' implementation of the management techniques

28  described in the SYP involves issues of fact that cannot

22

**United States District Court**
For the Northern District of California

be resolved through expert discovery alone.  Accordingly, absent some showing that this matter relates to allegations made in the complaint or during discovery, Plaintiffs may not pursue this allegation at trial without first giving Defendants an opportunity to take additional discovery.

5.   Plaintiffs have consistently alleged that the SYP failed to comply with Forest Practice Rules.  Accordingly, allegations of such violations will not be excluded.

6.   Impermissible species conversion (i.e., conversion of stands from predominantly redwood to predominantly Douglas-fir or from conifer to hardwood) was raised in the complaint, and evidence of concealment of such conversion will not be excluded.

7.   Although the complaint alleges that Defendants relied on an inflated inventory to create the THP for the Eel River Land, the SYP does not relate to this land and the complaint contains no allegations concerning inventory of the land covered by the SYP.  Nor have Plaintiffs demonstrated that they made the inventory allegation in response to Defendants' contention interrogatories or otherwise during discovery.  Defendants cannot defend against this claim without conducting fact discovery on the CDF's knowledge (or lack thereof) of the alleged infirmities in the inventory.  Accordingly, Plaintiffs may not proceed based on a theory that Defendants used an inflated inventory to create the SYP without first affording Defendants the opportunity to take additional

23

discovery.

8.   Plaintiffs have consistently alleged that Defendants manipulated the models in the SYP so as to overstate growth.  Whether or not they previously specified that growth was overstated by "at least 50 to 75 million board feet per year" is not critical to Defendants' ability to defend against this allegation.

9.   Plaintiffs have consistently attacked Defendants' yield projections.  Whether they specified that the "current and future yield tables were at least 3 times greater than was actually present on the property" is immaterial.

10.  Plaintiffs have long argued that Defendants' computer modeling was improper.  The fact that they did not previously specify that it was the "linear programming methods" that were improper is not material.

11.  Neither party explains the meaning of the term "Regime Code 301" or explains the significance of reducing to "120 basal area" the "regime trigger condition for Regime Code 301."  However, because this allegation relates exclusively to the computer model, Defendants can refute it through expert discovery and the Court will not preclude Plaintiffs from raising it at trial.

12.  Whether the computer model relied on clear-cutting in violation of environmental constraints can be resolved through expert discovery.  Plaintiffs therefore may proceed with this theory.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment (Docket No. 174).  The Court GRANTS IN PART and DENIES IN PART Defendants' motion to exclude Plaintiffs' new allegations of fraud (Docket No. 170).

Within two days of the date of this order, Defendants must provide Plaintiffs with a plan to take whatever additional fact discovery they deem necessary to enable them to refute those allegations that the Court has found are new and cannot be refuted through expert discovery alone.  Plaintiffs must file a notice with the Court two days thereafter stating whether, in light of this order and Defendants' discovery plan, they are willing to forgo pursuing such allegations at trial.  If Plaintiffs agree not to pursue those allegations, the parties' pre-trial materials must be exchanged five days thereafter and the trial will proceed on April 20, 2009 as scheduled.  If Plaintiffs wish to pursue any of the allegations, the parties should meet and confer within five days of Plaintiffs' notice to arrange for additional discovery and determine whether it will be necessary to continue the trial.  The parties must file a joint report with the Court two days after their conference.  The trial may be re-scheduled as appropriate.

IT IS SO ORDERED.

Dated: 3/10/09

_____
CLAUDIA WILKEN
United States District Judge