UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL., ET AL.,<br><br>　　　　　Plaintiff(s),<br><br>　v.<br><br>MAXXAM, INC., ET AL.<br><br>　　　　　Defendant(s).<br>_____/ | No. C-06-07497 CW (JCS)<br><br>**ORDER DENYING PLAINTIFFS'<br>MOTION FOR DISCOVERY<br>SANCTIONS<br>[Docket No. 184]** |

## I.   INTRODUCTION

Plaintiffs moved for discovery sanctions due to alleged spoliation of evidence by Defendants Maxxam and Hurwitz ("Defendants"). The matter was referred to the undersigned for decision. The Court heard argument on the motion on March 13, 2009. The Court is troubled by the fact that no instructions were given to VESTRA – the entity that had custody of the files at issue – to preserve evidence. Nonetheless, there is insufficient evidence that these files were still in existence by the time a duty to preserve evidence arose. Having considered all of the papers submitted by the parties and the arguments of counsel at the hearing, the Court DENIES Plaintiffs' motion.

## II.   BACKGROUND

### A.   The Complaint[1]

The present action is a *qui tam* action filed under the False Claims Act by Plaintiffs/Relators Richard Wilson and Chris Maranto on behalf of the United States. The Complaint is based upon the

---

[1] This factual background section is taken from Judge Wilken's Order Denying Defendants' Motion for Summary Judgment filed March 10, 2009 and is based on the allegations of the Complaint.

allegations that Defendants made false statements to the California Department of Forestry and Fire Protection (hereafter "CDF") in a sustained yield plan ("SYP"), the approval of which caused the United States to contribute $250 million toward the purchase of the Headwaters Forest.

According to the Complaint, this case began in 1985, when Defendant Hurwitz, a corporate raider, initiated the takeover by Maxxam of the Pacific Lumber Company. Hurwitz controls a majority of Maxxam's stock and combined voting power. Compl. ¶ 38. Included in Pacific Lumber's land was the Headwaters Forest, the largest privately owned redwood forest in the United States. According to Plaintiffs, Pacific Lumber had carefully managed its redwood forests before the takeover. However, Maxxam's purchase of Pacific Lumber was highly leveraged, and Plaintiffs allege that Defendants' priority was short-term profits, not long-term sustainability. Maxxam announced that it would escalate Pacific Lumber's logging activities to pay off its debt. According to Plaintiffs, Pacific Lumber's conservative forest practices became a thing of the past. The company's new direction under Maxxam's control caused a great deal of public controversy and led to highly publicized protests.

In the 1990s, Pacific Lumber was enjoined from harvesting old-growth timber that served as a habitat for the marbled murrelet, an endangered species of bird. It responded by suing both the state and federal governments, arguing that the enforcement of the Endangered Species Act constituted an unlawful taking of its property. To resolve this dispute, and quell the controversy over Pacific Lumber's aggressive forestry practices, Maxxam, Pacific Lumber, the State of California and the United States entered into a complex agreement under which Pacific Lumber agreed to dismiss its pending lawsuits and to sell its old-growth forest, known as the Headwaters Forest, and certain other land, including the Elk Head Springs Forest, to California and the United States. The Headwaters Forest would become a public wildlife reserve.

In exchange the government would purchase land adjacent to the Headwaters Forest, then owned by the Elk River Timber Company, for approximately $80 million. It would retain ownership of the land nearest Headwaters to serve as a "buffer zone" and transfer the rest to Pacific Lumber. The United States would pay Pacific Lumber $300 million in cash. California was required to contribute $130 million toward the total purchase price of $380 million and, in exchange,

would receive a conservation easement on the Headwaters property and the right to participate in management of the forest.

As a condition of the purchase, Pacific Lumber agreed to develop and to implement an SYP for its retained properties. An SYP is a master plan for the operational, environmental, economic and other issues related to timber harvesting over a large area. It is based on a computer simulation that estimates projected timber growth and stocking requirements in relation to a proposed harvest.

In 1997, Congress authorized the appropriation of $250 million (its share of the $380 million purchase price) to purchase the land from Defendants. California agreed to pay an additional $130 million. Before Congress would allocate any money, however, Pacific Lumber had to dismiss its taking lawsuits and California had to approve the SYP. In addition, the Secretary of the Interior had to issue an opinion of value. Both the United States General Accounting Office and the Secretary of the Interior concluded that the $380 million authorized for the purchase fell within the appraised value of the land.

Pacific Lumber developed an SYP that included different "alternatives": Alternative 25a provided for an average annual harvest of 136 million board feet; Alternative 25, Pacific Lumber's preferred alterative, provided for a permissible harvest of 178.8 million board feet per year. In February, 1999, the CDF approved Alternative 25a. Presented with the lower figure, Hurwitz threatened to cancel the sale of Headwaters Forest.

The United States Fish and Wildlife Service encouraged CDF to approve Alternative 25. On March 1, 1999, Plaintiff Wilson, then Director of CDF, approved Alternative 25. At the time, Wilson believed that the SYP model was accurate. He later learned, however, that the SYP did not comply with California environmental standards. Plaintiffs allege that the SYP was actually fraudulent in multiple respects. For example, the SYP model included hardwoods to satisfy residual stocking levels following the harvest of conifers. This made it appear that the conifer harvests were sustainable when, in reality, they would result in impermissible conversion of conifer stands to hardwood stands. Moreover, even with the inclusion of hardwoods, the residual stocking levels provided in the SYP fell below the Forest Practice Rules' minimum stocking standards.

3

According to Plaintiffs, truthful disclosure of growth and yield in the SYP would have resulted in an annual harvest of approximately ninety to 125 million board feet per year, far less than the 178 million that Maxxam needed to pay off its substantial debt. Plaintiffs allege that it was this debt, and not legitimate principles of long-term sustainability, that drove the models used to create the SYP. Plaintiffs estimate that, by intentionally manipulating the SYP, Pacific Lumber erroneously increased its harvest forecasts by approximately thirty percent. Wilson would not have approved the SYP had he known it was false.

Plaintiffs filed this lawsuit in December, 2006, asserting claims under the federal False Claims Act based on the false statements contained in the SYP. The Complaint in this matter was served on Defendants in May 2007.

On February 9, 2009, the District Court denied Defendants' motion for judgment on the pleadings. On March 10, 2009, the District Court denied Defendants' motion for summary judgment and granted in part Defendants' motion to exclude new allegations of fraud.

**B.     The Motion for Sanctions**

**1.     SYP Computer Modeling by VESTRA**

At issue in the present motion for sanctions is the SYP that Pacific Lumber submitted to the CDF and which was approved in March, 1999. The SYP was created using computer modeling. In order to create the SYP, Pacific Lumber used software called "FREIGHTS."[2] *See* Declaration of Brian J. Martinez in support of Defendants' Opposition to Plaintiffs' Motion for Sanctions, ¶ 2, Ex. A (Deposition Testimony of Eric Johnson). The inputs to the FREIGHTS software consist of various computer files that are specific to the program, including geographic information systems ("GIS") data, inventory data, prescription files, management files, and procedures files. *Id.* at Ex. A,

---

[2]There is some confusion about terminology in this motion. Plaintiffs state: "In the case at bar, the computer modeling simulation used by Defendants was known as the SYP Model (also known as "FREIGHTS"). Motion at 3. Defendants, on the other hand, state that FREIGHTS is the software used as part of the modeling process. In other words, the term "SYP model" and "FREIGHTS" are not interchangeable, as Plaintiffs suggest. Opposition at 4; *see also*, Declaration of Eric Johnson ¶ 5 ("The motion refers to an 'SYP Model,' which Plaintiffs define as 'the FREIGHTS Modeling system used for the Sustained Yield Plan.' This terminology is confusing, as these phrases mean different things.") At oral argument, and based upon the reply brief, it is clear that Plaintiffs are, for the most part, referring to various inputs to the SYP model that they allege are missing. The Court will refer to the evidence at issue in this case as "the SYP inputs."

4

65:1-66:13-15; 90:21-23; Johnson Decl., ¶ 7.  The FREIGHTS program then creates a simulation of growth and harvesting according to the prescriptions described in the SYP.  *Id.*  Basically, FREIGHTS is a software that "allows you to set up prescriptions and run them." *Id.* at 27:4-6.  The outputs from this process can be found in an "Access database." *Id.*

Pacific Lumber hired a consulting company, VESTRA, to perform this computer modeling using the FREIGHTS software.  Martinez Decl., Ex. A at 53:1-4.  An employee at the time, Eric Johnson, was the lead on the modeling project.  Johnson Decl., ¶ 1, 3, 4.  Mr. Johnson began working with the FREIGHTS program in 1997 or 1998 and left VESTRA in 2006.  During his tenure at VESTRA, he was the person largely responsible for running the model and maintaining the "FREIGHTS parameters."  Martinez Decl., Ex. A at 67:4-17; 69:14-15, 81:16-82:4.

VESTRA ran hundreds of modeling simulations for Pacific Lumber between the years of 1996-1999.  *Id.*, Ex. A at 142:17-22.  The inputs for these modeling simulations were "typically not saved." *Id.* at Ex. A, 143:2-7, 143:22-144:12; Johnson Decl., ¶ 10.  Mr. Johnson states in his declaration that he had over 200 clients, and had no standard practice for saving old versions of files.  *Id.* ¶ 6, 10.  When Mr. Johnson left VESTRA in 2006, he was not replaced with respect to computer modeling or maintaining the FREIGHTS system.  Martinez Decl., Ex. A at 86:6-11.

VESTRA's "general practice was to discard material that no longer had a business value." Johnson Decl., ¶ 10.  Some data was backed up and other data was not.  Martinez Decl., Ex. A at 82:21-83:1.  Contributing to this problem, is the fact that some of the back-up tapes were stored in a file cabinet in a disorganized fashion.  *Id.* at 84:4-5, 84:13-18.  In February 2007, VESTRA moved its offices.  During that move, VESTRA "discarded old back-up tapes and files because there was no business reason to keep them, storing them was expensive, and space at the company's new office was limited."  *Id.*, Ex. B at 27:11-28:6, 32:12-24.

Pacific Lumber and VESTRA had largely stopped using the FREIGHTS program by July, 2003, when approval of the SYP by the CDF was held invalid by the superior court in the EPIC litigation.  *See* Dkt. No. 185, Ex. B; Declaration of Jeffrey C. Barrett ¶ 4; Johnson Decl., ¶ 9. Defendants' use of FREIGHTS was limited to discrete projects.  Johnson Decl., ¶ 9, 13.  Defendants acknowledge that some of the data related to the computer modeling for the SYP may be missing.

5

According to Mr. Johnson, at the time of his departure from VESTRA in 2006, not all of the data related to the computer modeling for Alternative 25 existed. Johnson Decl., ¶¶ 11-12; Martinez Decl., Ex. A, 94: 7-16. Mr. Johnson was unable to find certain input files related to Alternative 25, the .RS2 and .MS2 input files. *Id.* ¶12. Mr. Johnson searched his computer, the VESTRA computer system, and various back-up tapes and CD's, but was unable to find these input files. Martinez Decl., Ex. A at 61:22-62:19. As a result, Mr. Johnson did not provide these data files to Pacific Lumber, and according to Plaintiffs, VESTRA also has failed to provide them. Mr. Johnson believes that any files went missing before he left VESTRA in 2006.[3] *Id.* at 61:18-24.

Toward the end of the SYP process in December 1998, Pacific Lumber decided to change its consulting arrangement with VESTRA. VESTRA ceased working directly for Pacific Lumber and began working for Pacific Lumber's then-outside counsel, Rawles Hinkle, Carter, Behnke & Ogelsby. VESTRA signed a new contract requiring that all information concerning the SYP modeling process be communicated to the law firm. The agreement provides in pertinent part:

> Consultant [VESTRA] understands that all technical data, analytical results, specifications, reports, analyses and other information or material . . . developed by Consultant [VESTRA] for transmission to RHCB&O in the course of performing its services hereunder constitute confidential communications which are intended to be protected against disclosure to third persons b the attorney-client privilege and/or by the attorney work product doctrine.)

Wilson Decl., Ex. I, Section 5(B). The president of VESTRA confirmed that after having worked with Pacific Lumber "for quite a long time," the arrangement with Pacific Lumber changed such that he was told: "[W]e want to continue working with you, but we need to work through an attorney." Wilson Decl., Ex. G at 63:6-63:10. During the 1996-1999 time period, Frank Bacik, counsel for Defendants Hurwitz, Maxxam and Pacific Lumber, was a partner at the Rawles Hinkle law firm. Declaration of Philip Gregory in Support of Reply Brief., Ex. F, 16:7-18. Mr. Bacik was involved with the negotiations leading up to the Headwaters Agreement (*id*., Ex F at 17:1-12) and was very

---

[3] Although Mr. Johnson testified that Plaintiffs could re-create the modeling scenario for the SYP by looking in the "Access database" provided to Plaintiffs in discovery, he admitted later in his deposition that the missing .RS2 and .MS2 files are "critical" and testified that "those are the ones I have not found." *Id.* at 94:14-16. Mr. Johnson also clarified that when he searched "for the model" he was referring to "looking for the exact FREIGHTS codes setup that was used for Alternative 25." *Id.* at 64:18-25. He was unable to find them. *Id.*

involved in the preparation of the SYP at issue in this case. *Id*. at 41:16-19. Counsel for Plaintiffs asked Mr. Bacik: "Were you representing Maxxam with respect to the submission of the SYP and the Headwaters Agreement?" Gregory Decl., Ex. F, at 71:13-15. Mr. Bacik replied "I was representing all the parties related to the applicant and its affiliates and parent, I think, all at the same time." *Id.* at 71:16-18. Mr. Bacik confirmed that the legal representation included Defendants Maxxam and Hurwitz. *Id.* at 19-20; 76:23-77:1-13. Starting in 2006, Mr. Bacik served as Pacific Lumber's vice president and general counsel. *Id.* at 12:1-7.

### 2. Litigation Regarding the SYP

Immediately after the CDF's approval of the SYP in 1999, the Environmental Protection Information Center ("EPIC") filed an administrative mandamus action in the Superior Court of California, Humboldt County. Motion at 4, *citing*, Wilson Decl., Ex. B. The EPIC litigation challenged the approval of the SYP by CDF. The EPIC litigation concluded in July 2008 when the matter was remanded to the lower court by the California Supreme Court to reinstate the judgment of the trial court invalidating the CDF's approval of the SYP. Wilson Decl., Ex. D.

On November 16, 2001, relator Chris Maranto was assigned to review a long-term THP[4] for 8,000 acres of land (the Eel River land) Pacific Lumber had purchased after the Headwaters sale. Maranto was the Sustained Yield Forester for CDF at the time. *See* Dkt. No. 247 at 8. Maranto discovered a number of errors in the THP, including its use of hardwoods to meet residual stocking requirements and various inconsistencies between Pacific Lumber's modeling outputs and the written presentation of the models. He also came to believe that Pacific Lumber had fabricated 200 million board feet of inventory for the purpose of inflating yield, and that the THP did not reflect Pacific Lumber's actual harvesting practices. Maranto discovered discrepancies in the Defendants' modeling and brought it to the attention of the Debtor Defendants through their senior forestry executive, Jim Adams, and Eric Johnson of VESTRA. As a result, it is alleged, the Defendants opted to use a different computer model in order to support their applications to CDF. Motion at 5,

---

[4] A THP is a "timber harvesting plan."

7

*citing*, Wilson Decl. Ex. C & E. The issue regarding the Eel river land was resolved. *See* Motion at 15:13-14.

In 2006, Pacific Lumber filed a claim against the State of California regarding the Headwaters Agreement. Counsel for Pacific Lumber, Edgar Washburn, a partner at Morrison & Foerster, counsel for Defendants, wrote a lengthy letter on January 3, 2006, warning the State of California to preserve all evidence that could relate to the Headwaters Agreement in any way, and warning of sanctions "for spoliation of evidence or potential evidence." Wilson Decl., Ex. F.

### 3. The Missing or Destroyed SYP Inputs

Plaintiffs claim that the following information related to the SYP has not been produced and "was destroyed" sometime in August 2007, after this Court's Case Management Order No. 1, which reminds the parties of their duty to preserve relevant evidence: 1) timber stand tables by vegetation type in 1986, 2) sysprint files, 3) actual constraint equations used in the chosen alternative model run, 4) FREIGHTS input files with starting inventory data, and 5) *.RS2 and *.MS2 input instruction files necessary to actually re-run the SYP model. *See* Declaration of Greg Blomstrom, ¶ 4. According to Plaintiffs' expert, Mr. Blomstrom, "[t]he missing items are critical to being able to fully evaluate the validity of the SYP Model as a whole. While the information provided does allow us to query the Alternative 25 output tables, there is no way to check how these were created when the model was run." *Id.*

The parties dispute what data is missing, when it went missing, and whether what is missing was intentionally destroyed. According to Eric Johnson, the "PALCO SYP model" no longer existed at VESTRA in June 2006. Martinez Decl. Ex. A, 61: 18-24. As discussed previously, Mr. Johnson recalls having looked for it before he left VESTRA in 2006, but was unable to find it. *Id.* The only specific information provided by Plaintiffs regarding the circumstances of the alleged destruction relates to VESTRA employee Eric Johnson's use of the software in August 2007. At that time, Mr. Johnson states that he returned to VESTRA to use the FREIGHTS software in connection with "a watershed analysis project[]" that was "part of an on-going interactive process with various governmental agencies." Opposition at 7, *citing*, Johnson Decl., ¶ 9, 13. Because FREIGHTS was outdated by summer of 2007, Mr. Johnson returned to VESTRA to use it because

VESTRA still had a computer that was set up to use the software. Johnson Decl., ¶13. Defendants claim: "Importantly, while Mr. Johnson ran the FREIGHTS program and utilized some site-specific outputs for Alternative 25 from the Access database, his work did not otherwise involve the 'SYP Model.'" Johnson Decl., ¶ 13. Eric Johnson states that he did not destroy any of the SYP modeling information in July 2007, or "at any other time." Johnson Decl., ¶ 13.

At no time did Defendants instruct employees at VESTRA to preserve all evidence related to the SYP model. Plaintiffs' counsel asked Mr. Stackhouse, the VESTRA 30(b)(6) witness, if anyone has ever requested that he preserve any data for the PALCO SYP, and Mr. Stackhouse responded: "No, no one has ever asked us." *Id.* at 128:24-129:4. Mr. Stackhouse, testified that prior to the office move in 2007, he "personally went through that giant storage room we had and [he] personally took hundreds and hundreds of old tapes and files out to our dumpster and discarded them . . . because there was no business reason to continue storing them." Wilson Dec., Ex. G, 27:22- 28:6. Mr. Stackhouse testified that the destruction of old records is done in the normal course of business at VESTRA. *Id.* at 128:8-14.

### 4. Plaintiff's Expert Report

Based upon the information provided in discovery, Plaintiffs' experts prepared a lengthy report disclosing their opinions on the SYP. Plaintiffs' experts detail the information produced and state: "Among these data were 21 MS Access databases comprising about 11.5 GB of data which appear to contain much of the work associated with Alternative 25, the alternative chosen (eventually) by CDF Richard Wilson. . ." Martinez Decl., Ex. D at 4. Plaintiffs' experts opine: "There is substantial documentation that the Defendants, Scotia Pacific and the Pacific Lumber Company supplied desired yields to Eric Johnson and VESTRA and that Eric Johnson manipulated FREIGHTS to reach those yields." *Id.* at 10.

Although Plaintiffs' experts at one point state that they "have almost literally been besieged with information" on the SYP in this case, they also point to missing computer files and information, and suggest in their report that they cannot conclusively state certain of their opinions without reviewing additional information that was not produced. *Id*. Plaintiffs' expert's report, written by Greg Blomstrom and Paul Harper states:

9

> We cannot conclusively state that the Defendants, Scotia Pacific and the Pacific Lumber Company manipulated the FREIGHTS model to favor Douglas-fir over redwood without more time to analyze the FREIGHTS *.FT1, *.FT2 and the *.FT3 files for Alternative 25, which PALCO has claimed were "destroyed" and are no longer available.

Martinez Decl., Ex. D, at 21.

As a result of the destruction of evidence, Plaintiffs ask this Court to impose the most extreme sanction available – terminating sanctions. Plaintiffs argue that the absence of the materials at issue makes a fair resolution of this case impossible, and that the prejudice is so great that no lesser sanction will suffice. In the alternative, Plaintiffs urge this Court to impose evidentiary sanctions and also ask this Court to recommend that the district court provide an adverse inference instruction at trial.

### III.  ANALYSIS

#### A.  Legal Standard on Motion for Sanctions

It is within the Court's inherent power to sanction litigants for the destruction of evidence where they knew or should have known that the documents were relevant to litigation or potential litigation. *See Unigard Security Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (holding district court had inherent power to exclude testimony where destruction of evidence made it impossible for opposing party to counter testimony). A party's destruction of evidence need not be done in bad faith to warrant imposition of sanctions, so long as there is a finding of fault. *Id.* at 368 n. 2.

The duty to preserve relevant evidence can arise even before the commencement of litigation, and sanctions may be imposed if Defendants knew or should have known that the evidence destroyed was potentially relevant. *Kitsap Physicians Serv.*, 314 F.3d at 1001 (a party engages in "willful spoliation" if that party has "some notice that the documents were potentially relevant to the litigation before they were destroyed."); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("Surely a finding of bad faith will suffice, but so will simple notice of potential relevance to the litigation.") Nor must the destruction of evidence occur after the specific evidence was requested. *See Wm. Thomas Co. v. General Nutrition Corp., Inc.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Rather, "[s]anctions may be imposed against a litigant who is on notice that

10

documents and information in its possession are relevant to litigation, *or potential litigation*, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information." *Id*. (emphasis added);   *Graham v. Teledyne-Continental Motors*, 805 F.2d 1386, 1390 n. 9 (9th Cir. 1987) (citing with approval *Bowmar Instrument Corp. v. Texas Instruments, Inc.*, 25 Fed.R.Serv.2d 423, 427 (N.D. Ind. 1977) for the proposition that sanctions are appropriate where party destroyed evidence it should have known would be relevant in future litigation);  *see also Capellupo v. FMC Corporation*, 126 F.R.D. 545 D. Minn. 1989) (imposing sanctions where defendant began destroying relevant evidence after hearing a rumor that plaintiff was considering filing a gender discrimination lawsuit but a month before the plaintiff filed her EEOC charge and several months before she actually sued defendants); *United States v. Kitsap Physicians Serv*., 314 F.3d 995, 1001 (9th Cir. 2002)(a party engages in "willful spoliation" if that party has "some notice that the documents were potentially relevant to the litigation before they were destroyed.")

Because of the potency of the court's inherent powers, they must be exercised with restraint. *Advantacare Health Partners L.P. v. Access IV*, 2004 WL 1837997 (N.D.Cal.)  (citing *Roadway Express Inc. v. Piper*, 447 U.S. 752, 764 (1980)).  One aspect of this restraint is determining the appropriate sanction in light of the specific abusive conduct.  *Id*.  In determining the appropriate sanction, courts should seek to impose a sanction that accomplishes the following objectives:

> (1) penalize those whose conduct may be deemed to warrant such a sanction; (2) deter parties from engaging in the sanctioned conduct; (3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*Id. at* * 3.  Courts have developed three types of sanctions for the destruction of evidence.  First, a court may instruct the jury that it may infer that evidence destroyed by a party was unfavorable to that party.  *See e.g., Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).  Second, a court may exclude witness testimony based upon the spoliated evidence.  *Unigard, supra*, 982 F.2d at 368-69. Third, the court can impose the harshest of sanctions – dismissal of the claim of the party who spoliated the evidence.  *See e.g., Allstate Ins. Co. v. Sunbeam Corp.,* 53 F.3d 804, 806-07 (7th Cir. 1995).

The Ninth Circuit has explained that "[b]efore imposing the 'harsh sanction' of dismissal," courts should consider the following factors:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, *supra*, 464 F.3d at 958. The district court is not required to "make explicit findings regarding each of these factors.

*Id.*

### B. Discussion

#### 1. Can Maxxam and Hurwitz be held liable for spoliation of evidence?

As a threshold matter, the Court addresses the parties' arguments regarding whether Defendants Maxxam and Hurwitz may be found responsible for any alleged spoliation of evidence because the SYP inputs were in the possession of VESTRA, an agent of Pacific Lumber, and not in Defendants' possession or control. The Court concludes that they can.

Defendants argue at length that Plaintiffs have not met their burden of establishing that Defendants Hurwitz and Maxxam had anything to do with the alleged destruction of evidence at VESTRA. Defendants argue further, that in order to so find, this Court would have to pierce the corporate veil. *See* Opposition at 18, *citing Pirv v. Glock Inc.*, 2009 WL 54466, at *5-6 (D. Or. Jan. 8, 2009) (plaintiff not responsible for spoliation where he did not have possession of evidence, did not destroy it himself, and did not employ third party who destroyed it); *Litton Systems Inc. v. Ssangyong Cement Industrial Co.*, 107 F.3d 30, 1997 WL 59360, at *6 (Fed.Cir. Feb 13, 1997) (district court erred in entering default against parent corporation as sanction of alleged spoliation by subsidiary).

The Rawles Hinkle firm retained VESTRA near the end of the Headwaters Purchase to do the computer modeling. The allegedly missing SYP inputs were in the possession of VESTRA as a part of that modeling process. Rawles Hinkle, in turn, *jointly* represented Pacific Lumber, Maxxam and Hurwitz in the Headwaters Purchase. It is entirely reasonable to hold Maxxam and Hurwitz

12

1 responsible for the preservation of evidence in the hands of its agent – the Rawles Hinkle law firm –
2 and therefore in the hands of the consultants retained by the firm.[5]

3 Of course, there is no spoliation without a duty to preserve evidence. The Court next
4 considers whether any SYP input files were destroyed *after* the duty to preserve them arose. In
5 order to decide the issue, the Court must determine whether any evidence was in fact destroyed, and
6 if so, whether it was destroyed at a time when there was a duty to preserve it.

### 2. Was any evidence destroyed/not preserved?

The Court finds that Plaintiffs have met their burden of demonstrating that certain evidence was not preserved. In their motion, Plaintiffs state generally that "the SYP Model" was destroyed "<u>after</u> the filing and service of this Complaint." Motion at 1. Plaintiffs' moving papers do not specify what aspect of the "SYP Model" is missing. However, Plaintiff's expert, Mr. Blomstrom, provides detail regarding what documents and computer files are missing in his declaration attached to Plaintiff's Reply Brief.[6]

Specifically, Mr. Blomstrom identifies the following missing evidence: 1) timber stand tables by vegetation type in 1986; 2) sysprint files; 3) actual constraint equations used in the chosen alternative model run; 4) FREIGHTS input files with starting inventory data; and 5) *.RS2 and *.MS2 input instruction files necessary to re-run the SYP Model. As stated previously, for ease of reference the Court refers to this data collectively as "the SYP inputs."

Mr. Blomstrom's conclusion is suspect. First, Mr. Blomstrom states in his declaration that *.RS2 files are missing, even though his expert report lists them as part of the documents he has

---

[5] The fact that the actual retention agreement between the law firm and VESTRA refers only to one of the law firm's joint clients is of no moment. *See* Wilson Decl., Ex. I at 1 (retention agreement, referring only to Pacific Lumber). As joint clients, Maxxam and Hurwitz had access to otherwise privileged information generated in the course of the joint representation. *See* Cal. Evid. Code Ann. § 962 (no privilege between two or more clients that have retained a lawyer on a matter of common interest and the communication in question is offered in a civil proceeding between one of the joint clients or his or her successor in interest and another such client or his or her successor in interest).

[6] The Court notes the impropriety of identifying what specific evidence Plaintiffs claim is missing, for the first time in their reply brief. The Court has received Defendants' objections to the Declaration of Greg Blomstrom and has considered the arguments of counsel on this point at the hearing, and in Defendants' supplemental filings. Because the Court denies Plaintiffs' motion in its entirety, Defendants' request to strike the Declaration of Greg Blomstrom is denied as moot.

13

reviewed: ". . . input and out put files including PTX, PT2, .RS2, SD, YD and various other files." Martinez Decl., Ex. D at 4. Moreover, any statement by Mr. Blomstrom that Defendants have failed to produce programs or files is to be given little weight, given Mr. Blomstrom's deposition testimony that "the hard drive [from VESTRA] has thousands of files on it that we haven't looked at." *See* Defendants' Objections to Declaration of Greg Blomstrom In Support of Plaintiffs' Reply Brief, Ex. A, 73:2-3. Nonetheless, to decide whether any data was not preserved, the Court evaluates each category of information identified by Mr. Blomstrom.

First, with respect to the "timber stand tables by vegetation type in 1986," Mr. Johnson points out that in fact "stand tables" were not produced because FREIGHTS uses "treelists." Johnson Decl. ¶ 4(a). Mr. Blomstrom admits that he has received a "CD with stand, site and tree inventory data in dbase format of the 1986 Hammon, Jensen and Wallen ("HJW") inventory data." *Id.* According to Mr. Johnson, this data is the inventory information that was used as an input in the VESTRA modeling process. *Id.*, ¶ 4(a). The Court concludes that this category of data was produced.

Second, regarding the "sysprint files," Defendants argue that these files are "never saved." *Id.*, ¶ 4(b). The modeling system converts and stores the relevant sysprint files into an Access database format. *Id.* Because Plaintiffs have the Access database, they have the relevant information from the sysprint files. *Id.* At oral argument on the present motion, counsel for Plaintiffs stated: "Therefore, if they're never saved [sysprint files] . . . we're not contesting that, and they had no obligation to produce them." March 13, 2009, Hearing Transcript at 36:17-18.

Third, Defendants suggest that Plaintiffs' argument that the "actual constraint equations used in the chosen alternative model run" makes little sense, as it is unclear what specific information is sought. *Id.* Mr. Johnson speculates that this refers to the missing *.RS2 and *.MS2 files, which Mr. Johnson admits he was unable to locate in June 2006 when he left VESTRA. In as much as Mr. Blomstrom admits in his expert report that he has the .RS2 file, the Court concludes that the .MS2 file was not preserved.

Finally, the "FREIGHTS input files with starting inventory data" were not preserved. As Mr. Johnson explains: "As with .RS2 and .MS2 files, these files were not specifically saved for

Alternative 25 or for the many other alternatives run for PALCO from 1997-1999 – they may be in the data from back-up tapes provided by VESTRA." Johnson Decl., ¶ 4(d).  Mr. Johnson points out that Plaintiffs or their expert could "re-create these input files using the 1986 treelist data and the lpdata.ede software module." *Id.*

Defendants argue that both VESTRA and Mr. Johnson responded appropriately to Plaintiffs' subpoenas and have produced all documents and information – including the FREIGHTS software, the "Access database" and outputs from the computer modeling for Alternative 25 – in their custody or control.  Opposition at 7-8.  Defendants contend that these outputs have all been produced to Plaintiffs in discovery.  *Id.* at 7, *citing*, Martinez Decl., Ex. A at 17:15-18:2, 89:18-21, 90:2-4, 90:11-20; Johnson Decl., ¶13.  According to Defendants, "[t]hese outputs are the key information needed to understand and evaluate the modeling that was conducted in connection with the SYP." *Id.* at 8, *citing*, Johnson Decl., ¶ 10.

Defendants' argument, however, focuses primarily on the "outputs." *Id.* at 7; *see also,* Johnson Decl., ¶ 10 ("These outputs are the key information needed to understand and evaluate the modeling that was conducted in connection with the SYP.")  Defendants' argument that "all outputs" have been produced and that this means that Plaintiffs have all that they need to re-create the SYP for Alternative 25 is undermined by the deposition testimony of Eric Johnson in which he explains that certain of the missing files are "critical."  Moreover, it ignores the fact that it is the *inputs* that are at issue.  As to these, Mr. Johnson testified that he has the software; however, "[t]here's the – the actual model which was used to run runs in the late 1990's.  You know, the – the – the values, the settings, all the things that were, you know, used to run that model.  No, I don't have those." Martinez Decl., Ex. A, 14:1-4.

The Court concludes that *some* of the SYP inputs were not preserved – specifically, *.MS2 input files and the input files with starting inventory data.  As Mr. Johnson testified when he described what he was looking for in 2006 before he left VESTRA:  "I was referring to looking for the exact FREIGHTS codes setup that was used for Alternative 25." Wilson Decl., Ex. E, 64:22-25. He confirmed that he could not find it. *Id.*

15

There is no evidence of intentional spoliation, however.  The evidence suggests otherwise.  VESTRA destroyed many back-up tapes and files during a move to smaller offices and that other files were simply destroyed in the ordinary course of business.  Indeed, in the creation of the SYP outputs, it was customary that inputs to the FREIGHTS software would be changed without saving the prior values.  As Mr. Johnson explained at his deposition, many of the parameters to the FREIGHTS model for Alternative 25 are not saved because there are numerous changes made as part of the process; these changes are not necessarily "saved."  Wilson Decl., Ex. E, 79:2-18.  Mr. Johnson explained: "When you're working with software like that, it's always kind of a guessing game as to whether . . . you're going to care later about whether you kept the old one or whether it's better just to make the change and not confuse yourself later by having multiple copies that you're not sure where they came from."  *Id*.  There is no actual evidence to support Plaintiffs' assertion of intentional spoliation other than Plaintiffs' expert's declaration in which he states that based upon his

> . . .experience working with models, the missing modeling programs and files appear to have been <u>intentionally selectively removed</u>.  We say this because there is no apparent reason why these particular sets of files would be missing from a computer or computers that were used in developing the SYP No. 06-002.  Logically, either everything would be gone because the hard drives were recycled or data would be complete given that all of the data would have been necessary in order to run and evaluate all the alternatives for SYP No. 06-002.

*See* Declaration of Greg Blomstrom in support of Plaintiffs' Reply Brief at 4.  Plaintiffs' evidence of intentional spoliation, therefore, seems based entirely upon its expert's speculation that people either destroy or recycle entire groups of files or leave them intact.  It is not based upon any direct evidence of spoliation or other misconduct.  Moreover, as discussed above, Mr. Blomstrom does not even have an adequate basis for his conclusion that the files weren't produced – having failed to review all of the produced data –  let alone for his more extreme conclusion.

The Court next addresses when a duty to preserve the missing evidence arose.

### 3. When did a duty to preserve evidence arise?

Plaintiffs point to three events that occurred before this action was served, which Plaintiffs claim triggered a duty to preserve evidence: (1) the Epic lawsuit in 1999; (2) Chris Maranto's communication with Defendants in 2002 about the THP for the Eel River land; and (3) Pacific

16

Lumber's claim against the State of California for breach of the Headwaters Purchase Agreement in 2006. The Court concludes that only the latter gave rise to a duty, in January 2006, to preserve the inputs to the FREIGHTS software that are at issue here.

The EPIC lawsuit – which lasted from 1999 to 2008 – was an administrative challenge to the CDF approval of the SYP, and did not give rise to a duty to preserve the SYP inputs. There is no dispute that the FREIGHTS model, and the inputs to that model, were neither part of the administrative record nor challenged in the EPIC litigation. The only decision challenged was that of the CDF based on the information that was before it. There was no assertion that the computer model or the inputs to it were fraudulent.[7]

The communication in 2002, by relator Chris Maranto, the Sustained Yield Forester for CDF, to the Defendants also did not give rise to a duty to preserve the SYP inputs. Maranto's comments in 2002 were not part of Alternative 25. They were directed at Pacific Lumber's plan for harvesting 8,000 acres of property that the company acquired after the closure of the Headwaters deal. *See* Opposition at 14. Indeed, Judge Wilken has so found in her order denying Defendants' motion for summary judgment: "But the allegations . . . contained in ¶ ¶ 110-117 of the complaint, discuss the course of Maranto's discovery of the infirmities in the THP for the Eel River land, not the SYP that was required by the Headwaters Agreement." Order Denying Summary Judgment, Docket No. 247 at 18. There was no threat of litigation at this time and importantly, no allegation that the SYP data was false. Judge Wilken ruled that "[i]t was not until 2004, based on his knowledge of Defendants' manipulations of the Eel River THP and spurred by Defendants' updated inventory, that he says he

---

[7] Plaintiffs cite to the deposition testimony of Jeffrey Barrett, CEO of SCOPAC in support of their contention that Defendants have "admitted that the SYP Model" was relevant to the EPIC litigation and have even accessed it during the course of the EPIC litigation. Motion at 5. Presumably this testimony is also proffered to demonstrate that the SYP Model existed throughout the course of that litigation. The testimony does not prove this point. The issue is related to the confusion regarding terminology in this case. Plaintiffs use the term "SYP model" and "FREIGHTS model" interchangeably. The testimony of Jeffrey Barrett seems clear that he was discussing use of FREIGHTS software and does not say what parts of the SYP Model were used or in existence. Wilson Decl., Ex. C, 36:3-37:11.

17

1 came to believe the SYP was fraudulent."[8]  Moreover, the issues relating to this new parcel of land
2 were resolved.  *See* Docket No. 184 at 15: 13-14.  The Court is not persuaded that a duty to preserve
3 all SYP inputs was triggered by Maranto's review in 2002.

4       The Court is persuaded, however, by Plaintiffs' argument regarding Pacific Lumber's claim
5 against the state of California concerning the Headwaters Agreement.  In that claim, Pacific Lumber
6 alleged that the State of California breached the Headwaters Agreement in a variety of ways.
7 Wilson Decl., Ex. F.  This claim gave rise to a duty to preserve all evidence related to the
8 Headwaters Agreement – including all SYP inputs.  Indeed, on January 3, 2006, counsel for
9 Defendants, Edgar Washburn, wrote a letter to the State of California entitled "Notice to Prevent
10 Spoliation of Documents."  In it, Mr. Washburn advised that two of the Debtor Defendants, PALCO
11 and SCOPAC had submitted a claim that was "likely to lead to litigation" over the Headwaters
12 Agreement.  Wilson Decl., Ex. F at 1.  The letter explains that the duty to preserve evidence is
13 broad, including the duty to preserve any evidence "that may relate *in any way*" to the Headwaters
14 Agreement. *Id.* (emphasis supplied).  The relevance of the information related to the SYP model to
15 the claim was later confirmed when the State filed Answer its Answer on March 12, 2007, which
16 contained an unclean hands defense.  Martinez Decl., Ex. G at 3.

17       While the actual claim was filed by Pacific Lumber and an affiliate, they were represented by
18 Morrison & Foerster – who also represented Defendants with respect to the Headwaters matter at the
19 time.  The parties do not dispute the fact that Morrison & Foerster represented Defendants as well as
20 Pacific Lumber on the Headwaters matter in 2006.  *See* Dkt. No. 252 at 5:23-25; 6:1-4. (identifying
21 Morrison & Foerster as counsel for all entities, including Maxxam and Hurwitz in 2006, with no
22 objection by counsel for Defendants).  Defendants are therefore chargeable with their agent
23 Morrison & Foerster's knowledge that a duty to preserve evidence had been triggered. *See Clark*
24 *Equipment Co. v. Wheat*, 154 Cal.Rptr. 874, Cal.App.1.Dist. (1979) (principal is chargeable with,
25 and bound by, the knowledge of his agent).

---

[8] While the District Court has concluded that Plaintiffs were first aware in 2004 that the SYP in this case was fraudulent, there is no evidence before this Court that this knowledge was communicated to Defendants at that time or translated into an actual threat of litigation.

Because the letter warning the State of California to preserve all evidence relating to the Headwaters Agreement was sent in January 2006, the Court finds that Defendants were on notice at that time of a duty to preserve all evidence relating to the Headwaters Agreement, including the inputs to the SYP model at issue.

### 4. Did the missing evidence exist in January 2006?

Although the Court concludes that evidence was not preserved or is missing, and that Defendants had a duty to preserve the SYP inputs beginning in 2006, Defendants cannot be found liable for spoliation unless such evidence existed in January 2006 and was destroyed or lost *after* that date. The Court finds that Plaintiffs have not satisfied their burden of establishing that evidence was destroyed or lost after the duty to preserve it arose. There is little evidence regarding the date and circumstances under which the inputs to the SYP model were lost or destroyed. As it is Plaintiffs' burden to demonstrate that the SYP inputs existed at a time when a duty to preserve evidence existed, the absence of evidence demonstrating this fact requires the Court to deny this motion.

The first date on which there is evidence demonstrating that the SYP inputs were missing is June 2006 when Eric Johnson searched for certain input files at VESTRA and could not locate them. There is no evidence to suggest when the files were in existence during the previous six months. Indeed, as discussed above, there is evidence that files of these types – inputs to the computer model – were routinely not saved or destroyed as a matter of ordinary business practice by VESTRA. The model to which these inputs were relevant – the FREIGHTS model – had also been obsolete for several years by 2006. As a result, Pacific Lumber no longer relied on the SYP and instead opted to use a different procedure known as "Option A" in order to seek approval of future harvesting plans. Opposition at 14, n. 8. By this time, FREIGHTS was rarely used; instead, Pacific Lumber employed a new consulting firm and computer model called "OPTIONS" for its long-term planning. Accordingly, if the data did not exist in June 2006, it is likely that it also did not exist in January of that year. In any event, Plaintiffs have not shown to the contrary that the SYP inputs files existed after January 2006.

The evidence submitted by Plaintiffs does not support the contrary conclusion. Plaintiffs allege, for example, that Eric Johnson used the FREIGHTS software in the summer of 2007 and that this establishes that all necessary input files for the SYP model existed at that time. There is no evidence, however, that the particular missing files at issue in this motion were used during the summer of 2007. The last date on which it appears that the model was run in connection with Alternative 25 was in 2001-2002. Plaintiffs also point to the fact that Mr. Johnson backed up all of the FREIGHTS files in August 2007. Again, there is no evidence in the record that these back-ups included the particular missing files. Johnson Decl., ¶ ¶ 11-13. Indeed, at oral argument, Defendants represented that this backup has been produced in this litigation.

Accordingly, Defendants cannot be held liable for evidence that was destroyed or lost before they had an obligation to preserve it.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for sanctions is DENIED. Defendants' motion to strike the Declaration of Greg Blomstrom is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: March 27, 2009

JOSEPH C. SPERO
United States Magistrate Judge